# Linda CAMARILLO-COX v. ARKANSAS DEPARTMENT OF HUMAN SERVICES

CA 03-861                                                         185 S.W.3d 133

Court of Appeals of Arkansas
Division I
Opinion delivered June 16, 2004
[Rehearing denied September 29, 2004.*]

---

* PITTMAN, J., would grant rehearing and wrote a dissenting opinion that was not for publication.

*Janet L. Bledsoe*, for appellant.

*Gray Allen Turner*, for appellee.

JOHN B. ROBBINS, Judge. Appellant Linda Camarillo-Cox appeals the termination of her parental rights to four children, A.S. (male born 1/17/94), S.S. (female born 11/13/95), J.N. (male born 12/9/99), and M.N. (male born 3/3/01), as entered by the Benton County Circuit Court.[1] The Department of Human Services (DHS) sought termination on the basis that the children had been out of the home for more than twelve months, and despite meaningful effort by DHS to help remedy the conditions that caused removal, those conditions were not remedied by appellant. DHS also argued that the children had been subjected to aggravated conditions in that appellant manifested indifference or incapacity to correct those conditions, and that she had not provided meaningful support or contact during the pendency of the case. The trial judge found that DHS had proved its contentions by clear and convincing evidence. On appeal,

---

[1] The legal father of J.N. and M.N. participated in the permanency planning hearing, entering his objection to proceed because he was not properly notified of DHS's intervention and actions. The trial court resolved that issue by ordering that the goal with regard to him be continued efforts at reunification. He is not appealing.

Any and all putative fathers of A.S. and S.S. were deemed to have their parental rights terminated by the order on appeal. No putative father of A.S. or S.S. appeals.

appellant argues that the trial judge clearly erred by finding that DHS proved grounds to terminate parental rights by clear and convincing evidence. We reverse and remand.

Termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Wright v. Arkansas Dep't of Human Servs.*, 83 Ark. App. 1, 115 S.W.3d 332 (2003). Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Crawford v. Arkansas Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997). Pursuant to Arkansas Code Annotated section 9-27-341(b)(3) (Repl. 2002), the facts warranting termination of parental rights must be proven by clear and convincing evidence. Clear and convincing evidence is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). In reviewing the trial court's evaluation of the evidence, we will not reverse unless the trial court clearly erred in finding that the relevant facts were established by clear and convincing evidence. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Brewer v. Arkansas Dep't of Human Servs.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001).

The legislative intent, found in Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2003), states that the intent is to provide permanency in a juvenile's life in all instances where return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective.

With these parameters of appellate review, we examine the evidence. Appellant first made contact with DHS when a protective-services case was opened on May 29, 2001, after A.S. was found a mile away from home by a police officer. DHS offered parenting classes and child care to appellant, which were refused. DHS provided the family with food stamps, and the children were on Medicaid. S.S. had severely crossed eyes, because of which she needed to wear corrective eyeglasses. During visits, DHS personnel rarely observed S.S. wearing them. Appellant was known to be depressed and on medication; however, appellant took the medicine sporadically at best.

Appellant's children came into protective custody on August 22, 2001, when the children were in their maternal grandparents' care at their Siloam Springs, Arkansas, trailer. The grandmother, a disabled woman, informed a DHS caseworker that she was unable physically or financially to continue to care for the children for her daughter in their two-bedroom trailer. As the caseworker interviewed the children, appellant arrived and accused her mother of lying. Then, appellant gathered the children's social security cards and birth certificates, handed the documents over to the caseworker, said she was giving up, and told the caseworker to put the children in foster care. Appellant announced that she was leaving on a bus for Texas, said was going to kill herself, entered her car, and drove away. Emergency custody took place that day.

On September 5, 2001, the trial court placed the children all together with their maternal aunt and uncle. Also in September, an adjudication hearing was conducted wherein the children were determined to be dependent-neglected. Appellant appeared at that hearing, stipulating to probable cause. Appellant's counsel stated that appellant was having problems with her medications and did not have a home of her own at the time. The trial judge ordered appellant to complete the following tasks in order to have the children return: (1) attend individual counseling; (2) obtain and maintain stable and appropriate housing; (3) obtain stable employment; (4) keep DHS notified of her address and employment status; and (5) cooperate with DHS in achieving the case plan goals.

On November 20, 2001, a review hearing was conducted in which it was learned that appellant married Abie Cox, a man convicted of a sex-related offense. Appellant contended that it was not as bad as portrayed, because when Abie was seventeen he had consensual sex with a fourteen-year-old girl, whose father was mad at him. Appellant testified that she was still living with her parents in Siloam Springs, but that she had been approved for government housing and was on a waiting list for an apartment. Appellant said that there were five people living in her parents' trailer. Appellant said she was trying to get caught up on her debts. Appellant explained that she had been working for a month and a half, that her weekly income of $173 exceeded her expenditures, but that she could not make her payments because she owed late fees on top of the bills. Appellant stated that she visited her children at her aunt and uncle's house about once a week and gave them about $20 per week for the children. Appellant was not attending counseling, but appellant said she would attend counseling only in Siloam Springs,

to which she preferred to drive herself if she had the gasoline. Appellant said she could not be counseled at Ozark Guidance Center because she owed money there from earlier sessions, though she preferred to have counseling with her regular counselor, Megan, who worked for Ozark Guidance Center.

A DHS family service worker, Stormy Randolph, confirmed that the maternal aunt and uncle said appellant visited about once a week, and she stated that DHS was providing appellant with parenting classes. However, Ms. Randolph was concerned that reunification might not occur in the near future because appellant was not attending counseling for her depression, she was not earning enough to support herself, much less four children, given her limited hours of work, she had not obtained housing on her own, and she had married Mr. Cox, who was a sex offender. Ms. Randolph said that DHS could provide the counseling and the transportation to Rogers where those services were available, but appellant did not want to because her physician was in Siloam Springs.

The trial judge concluded that DHS had made reasonable efforts, but that DHS should assist more in the acquisition of housing. He commented that appellant was argumentative and said that she could take care of things on her own, but that her performance had indicated otherwise. The judge was unwilling to find that appellant's husband was a danger to the children without more proof. The judge directed appellant to visit her children, to continue to look for appropriate housing, to regularly attend counseling, and that if she were making support payments, to have proof of it.

On January 15, 2002, an emergency hearing was conducted because the children's aunt and uncle decided that they no longer wished to have the children. They did not understand that custody would last as long as it had. The children returned to the custody of DHS, and the children were sent to foster homes.

On February 19, 2002, a review hearing took place. It was learned that the children had been referred to counseling since being taken back into DHS's custody, that appellant's husband had been incarcerated for a parole violation, and that appellant had not yet attained her own housing or an adequate income to care for four children. The judge noted that the children had been out of the home for about six months, and further, "I'm afraid that all too often, young parents believe that if they just come and tell me that

they've attempted to do things, that that will be good enough." The judge reiterated that the law requires that "they actually accomplish things, so that their children's interests are first." The judge told appellant that he would rather she be scared to lose her children and work extraordinarily hard than to have to terminate her rights. The judge ordered the children to remain in foster care, that the two older children receive counseling, and that efforts be made to ensure that S.S. wore her glasses. The judge reaffirmed the case-plan requirements on appellant, adding that she must take her medication.

At a review hearing on May 7, 2002, evaluations indicated that appellant suffers from major depression and exhibited some behavioral problems. Appellant's counselor, Megan, was losing hope that appellant could be a fit parent. The judge cautioned appellant's counsel to understand that DHS was moving toward a permanency planning hearing, that the children had been out of the home for nearly a year, and that if she did not make major progress she could expect to lose her parental rights. The judge outlined the requirements on appellant: stable employment; stable housing; attend counseling; take medication; complete parenting classes; maintain contact with DHS; attend visits or notify for cancellation or rescheduling; and cooperate with DHS to reach goals.

A permanency planning hearing was conducted on August 13, 2002, and Miguel Nava came forward for the first time claiming to be the father of J.N. and M.N. Mr. Nava was appointed counsel. The maternal grandparents sought to intervene, which was granted. At the conclusion, the trial judge set the case for a termination hearing in November 2002. The order filed of record from the permanency planning hearing ordered that appellant comply with the following terms and conditions: maintain stable employment; obtain stable and appropriate housing; inform DHS of her address and phone number; attend counseling; take her medication; attend regularly scheduled visits with the children and notify DHS of any changes or cancellations; and cooperate with DHS on the case plan goals.

At appellant's request, a continuance was granted, so the termination hearing did not occur until December 30, 2002. Appellant appeared and testified that she had her own three-bedroom apartment in Siloam Springs that she had lived in for about five or six months. She had been married for about a year, but her husband had not lived with her except for the last two

months due to his incarceration. She said that before that, "I lived here and there, with my parents, and with friends." Appellant said she worked for a company that produced Hallmark cards making $7.50 an hour, but that she and her husband were currently laid off. They expected to be recalled to work the first week in January. Though she did not have a sitter ready, she said her mother could help watch the children while she and her husband worked. Although she had missed some visits due to illness or work, she said she visited her children every Friday. Appellant said she was regularly taking a prescription medication called Celexa for her depression and had done so for about four months. She acknowledged that she had this prescription starting in the spring of 2001 but that she did not take it as prescribed and even stopped taking it for a while. Appellant said that she had her own counselor, Megan Lescher at Ozark Guidance, who she saw usually twice per week in the spring of 2001, but she stopped seeing her and only scheduled another appointment the Friday before the termination hearing.

Appellant believed that though she could not handle the pressure in the beginning, she had become very able to do so as long as she took her medicine. She felt more able because her bills were paid current, her father had bought her a car, she could sell things she did not need to pay bills, she had family to help her, and she was ready to meet her children's needs. She explained their needs as love, food, air, shelter, and discipline. Appellant testified that she was sure she could work something out for childcare during work hours, and the older two would attend school.

Appellant acknowledged that Miguel Nava was the father of her two youngest children. She testified that they formerly lived together, he worked, and she stayed home, but in approximately April 2001, they separated because he stabbed her in the presence of the children. Appellant said that Miguel did not have much involvement in the children's lives after that, except that he did pay some support. Appellant acknowledged that two other men were the natural fathers of A.S. and S.S. She believed that A.S.'s father was deported to Mexico and that S.S.'s father was deceased.

Appellant complained that DHS did not help her find housing, pay rent or bills, offer to provide transportation, or provide counseling. Appellant said she had completed parenting classes. However, appellant agreed that she had told DHS that for the most part she wanted to do it on her own. Appellant testified that although she knew about her husband's parole conditions, she would be around to supervise her children and that they would not

be alone with him. Further, she offered to remove her husband from the household to avoid termination of her rights.

Her husband's parole officer, Jeff Bland, testified that Mr. Cox had been on parole since October 2002 and would be until 2006. Bland related that his parole had the usual conditions, plus he was (1) not to have unsupervised contact with minors, (2) to avoid high-risk situations, (3) to undergo periodic drug testing, and (4) to abstain from alcohol consumption. Bland said that he explained to appellant that she needed to think about taking him into her house given that she was trying to get her children back; she still wanted to take him. Bland said that Mr. Cox had been generally compliant with his parole conditions since October and had not tested positive for drugs.

Appellant's counselor, Megan Lescher, testified that she held a master's degree in counseling and provided counseling for a wide range of problems. She said she often referred patients to a psychiatrist with the idea that medication would help, and that 95% of the time, the psychiatrist agreed with her assessment. Lescher said that she first encountered appellant in January 2001 when appellant came in concerned about her son A.S. Lescher recognized that appellant had a flat affect, she cried and was despondent, she had nightmares, and she felt detached. Lescher eventually assessed appellant as having major depression, borderline personality traits, and post-traumatic stress disorder based upon a history of physical and sexual abuse. Lescher said that appellant was sporadic in coming to see her for counseling early on, making it to two or three sessions, and then just failing to make appointments for a while. Other than the Friday prior to this hearing, Lescher had not seen appellant since February 2002. Lescher said that appellant told her that she had six months of employment and was taking her medication. With that history, Lescher deemed her prognosis much better than in the beginning when she was consistently unreliable and unstable. However, Lescher admitted that she had not personally seen this new-found progress because she had only seen her in one recent one-hour session. Lescher said that the most important factor in appellant's stability was to stay on her medication.

Another counselor at Ozark Guidance, Don Beckman, testified that he held a master's degree and had been in the profession for about twenty-five years. Around February 2002, Beckman began work with A.S. and S.S., who were about eight and seven years old at that time. Beckman was assigned to them

because they were having difficulty being separated from their mother and being in foster care. A.S. expressed anger and aggression, and Beckman did not see much improvement in the four months he saw A.S. However, in those same four months, S.S. made great strides, which Beckman believed was in some part due to improvement with her vision.

A family therapist from Little Rock, Tina Rushing, testified that she had worked with A.S. since July 2002,[2] and that he exhibited depression, withdrawal, anxiety, and emotional sensitivity. She expected to see explosive aggression, but that did not happen. They worked on A.S. verbalizing his feelings instead of withdrawing. A.S. was receiving supportive services for learning disabilities in reading and spelling, and he was making progress. He expressed hope that he could return to his family, but he was angry and hurt that it was necessary to be removed. A.S. was also confused and hurt that his mother left him with his grandparents off and on since he was a toddler. Given that he was close to his siblings, he worried about termination and how it would affect his sister and brothers. Rushing expressed that A.S. needed permanency and that his life in "limbo" needed to end.

Lee Wade, three-year-old J.N.'s counselor, testified that J.N. initially expressed rigid, cautious, and guarded play that was not developmentally appropriate. J.N. had a high startle response, and he was overly aggressive for his age. Over the course of about eight months of treatment, Wade saw major improvement: more displays of exploration and confidence, and decreases in aggression. Wade did not believe that termination of parental rights would cause significant trauma for him.

Next came the testimony of Jennifer Graham, the DHS family services worker. Graham said that the children were presently eight (A.S.), seven (S.S.), three (J.N.), and one and a half (M.N.). Graham recalled that there was a protective services case opened on the family on May 29, 2001. Services were offered right away, but the children came into protective custody in August 2001 due to abandonment. Graham agreed that the children had been in several residential placements during the pendency of this case. A.S. had been in seven different placements, and S.S., J.N., and M.N. had been in four different placements. Currently the

---

[2] In the latter portion of their foster-care time, A.S. had been moved to the Little Rock area.

three youngest children were together in northwest Arkansas; the oldest was in Little Rock. Graham recounted the services provided including counseling, transportation, visits with family, medical/dental/vision treatment, and educational services.

Graham said that appellant had lived in her current apartment since August 5, 2002, but she understood that this was temporary housing. When Graham visited early on, there were two men living there with appellant, later joined by appellant's husband. Graham agreed that appellant had acquired appropriate furnishings in the months that followed. Graham testified that appellant missed some visits, but she usually appeared, sometimes late. Graham acknowledged that most of the missed visits were attributed to appellant's work schedule and some were due to DHS's need to cancel. Appellant never asked for transportation assistance with the exception of visits to the oldest child in Little Rock. Graham agreed that appellant brought little gifts, clothing, and sometimes money to the children during visits, but she said appellant did not pay child support to DHS. Graham listed the services provided to appellant as including counseling referrals, transportation, housing referrals, visitation, and parenting classes. Graham agreed that appellant had completed parenting classes.

Though appellant had attained an apartment with appropriate furnishings and some employment history, and Graham acknowledged that appellant had basically completed her case plan, she did not deem these recent efforts to show stability. Graham testified that these positive changes occurred at or around the time that the termination hearing was set at the August 2002 permanency planning hearing. Graham recalled that there were referrals for counseling in August 2002, but there was no counselor assigned to her and no appointment made; appellant was on the waiting list. She stated that there was nothing else DHS could offer that would ensure reunification in a short period of time. Graham pointed out that the children had been out of the home for sixteen months, that there were prospects for all of them to be adopted and even one that might take all four children together, and that the children's best interest was served by termination of parental rights.

In argument of counsel, it became clear that Mr. Nava's rights were not going to be terminated at this point. However, because the two older children's fathers were either deceased or did not appear, there was concern that the children as a sibling group would be split up. Counsel for DHS suggested that it was

possible for A.S. and S.S. to be adopted together. The attorney ad litem, given this quandary, continued to support the position that appellant's parental rights to all four children should be terminated.

The judge rendered his findings from the bench, finding that it was his sad duty to terminate appellant's parental rights to all of the children, acknowledging that appellant loved them. The judge commented that appellant had been in and out of the children's lives, that the pattern had not substantially changed in the time while the children were out of her custody, and that it was in the children's best interest to give them an opportunity for stability and permanence in their lives. A.S. and S.S. were free to be adopted, while J.N. and M.N. had a pending case with their legal father. An order was filed on February 7, 2003, commemorating these findings. The order stated that DHS had proved that (1) the children had been out of the home for at least twelve months and that despite meaningful effort by DHS to rehabilitate the home and correct the conditions that caused removal, those conditions had not been remedied by the parent; (2) appellant had failed to provide meaningful contact or support while the children were out of her custody; and (3) appellant manifested an indifference or incapacity to correct the conditions leading to removal of the children. *See* Ark. Code Ann. § 9-27-341. This appeal resulted.

If any one of the bases for termination are supported by clear and convincing evidence, then we must affirm. We deem none of the alleged bases to be so supported, and we hold that they are clearly erroneous findings.

During the first twelve months that the children were out of the home, appellant undoubtedly manifested that she could not or would not do what was necessary to accomplish the return of her children. However, for the five months between the permanency planning hearing on August 13, 2002 and the termination hearing on December 30, 2002, appellant showed significant improvement and met nearly all of the case plan requirements. She attained employment, albeit at a temporary service, she acquired an apartment that was suitably furnished and clean, she was consistently taking her medicine, she completed more parenting classes than were required, she visited and gave small token gifts to her children, she maintained contact with DHS, and she reinstated counseling. Of the case plan goals set out for her to accomplish in order to gain the return of her children, she accomplished all except a steady course of counseling. Appellant

indeed attended counseling very little and very late. However, appellant had a history and rapport with her counselor, and her counselor was encouraged at her progress that she said she maintained for several months. Importantly, her counselor testified that the most important factor in her stability was taking her medication, which she was doing. Moreover, DHS acknowledged difficulty in making counseling available to appellant. In short, the unrebutted proof demonstrated that appellant made significant and sustained progress in the five months prior to termination of her parental rights. To find otherwise was clearly erroneous.

■■■ There were two alternative bases for termination that the trial judge found to be proved by clear and convincing evidence: (1) lack of meaningful contact or support; and (2) manifest unwillingness or incapacity to correct the conditions. These are likewise clearly erroneous findings. Any party seeking to terminate the parental relationship bears the heavy burden to prove by clear and convincing evidence that the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile. *See Minton v. Arkansas Dep't of Human Servs.*, 72 Ark. App. 290, 34 S.W.3d 776 (2000). Material support consists of either financial contributions or food, shelter, clothing, or other necessities where such contribution has been requested by the juvenile's custodian or ordered by a court of competent jurisdiction. *Id.* Appellant was not under any order to pay support, but in any event, it was uncontested that she sent money or gifts within her ability in her dire financial situation. Indeed, according to DHS, one of the reasons that it opposed returning the children was that it concluded she was not earning enough money. As concerns "meaningful contact," DHS conceded that she visited the children fairly regularly when she was not working. Because we have found error in the conclusion that appellant failed to remedy the conditions causing removal of her children, we consequently find reversible error in the finding that appellant manifested unwillingness or incapacity to remedy the conditions causing removal.

Reversed and remanded for proceedings consistent with this opinion.

Stroud, C.J., and Gladwin, J., agree.