Linda CAMARILLO-COX *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

04-752                                              201 S.W.3d 391

Supreme Court of Arkansas
Opinion delivered January 20, 2005

---

*Lisa Lundeen Gaddy*, for appellant.

*Gray Allen Turner*, for appellee.

DONALD L. CORBIN, Justice. Appellant Linda Camarillo-Cox appeals the order of the Benton County Circuit Court terminating her parental rights to her four children. On appeal, she argues that the trial court erred in terminating her rights because there was no clear and convincing evidence supporting termination. This case is presently before us on a petition for review from the Arkansas Court of Appeals; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 2-4(c)(iii). We affirm the order of the trial court.

On August 24, 2001, DHS filed a petition seeking emergency custody of Appellant's four minor children, A.S. (d.o.b. 1/17/94); S.S. (d.o.b. 11/13/95); J.N. (d.o.b 12/9/99); and M.N. (d.o.b. 3/3/01), on the basis that the children had been abandoned. In its petition, DHS averred that Appellant threatened to commit suicide, gave the caseworker the children's birth certificates and social security cards, and then left, stating that she was going to Texas. The trial court granted DHS's motion, and all four children were subsequently placed with their mother's aunt and uncle, Noelia and David Garcia Sr.

After conducting an adjudication hearing, the trial court, in an order dated September 25, 2001, ruled that the children were dependent-neglected. The goal set in the case was reunification. The case plan established in this case required Appellant to: (1) attend parenting classes; (2) obtain and maintain housing and employment; (3) regularly attend visitation with her children; (4) continue to attend counseling; and, (5) take her prescribed medication.

A review hearing was held on November 20, 2001, and the court was apprised that Appellant had recently married Abie Cox, a convicted sex offender. Appellant testified that she was aware of her husband's past, specifically that he, at the age of seventeen, engaged in intercourse with a fourteen-year-old girl. She further testified that she was currently living with her parents but had been approved for government housing. Appellant stated that she was working but that her expenditures exceeded her income. According to Appellant, she visited her children at the Garcia's residence approximately once a week. She also gave the Garcias $20 per week for the care of her children. Appellant admitted that she was not in counseling because she owed money to Ozark Guidance

Center. She indicated that she would attend counseling in Siloam Springs, but preferred to see her regular counselor who worked for Ozark Guidance.

Stormy Randolph, a DHS family service worker, stated that the Garcias confirmed that Appellant visited the children weekly. She also stated that DHS was providing Appellant with parenting classes, but she had doubts about reunification in the near future. Randolph expressed concern because Appellant was not attending counseling, was not earning enough money to support herself or her children, had failed to obtain housing, and had married a convicted sex offender.

At the conclusion of the hearing, the trial court stated that it believed DHS had made reasonable efforts, but expressed concern that the agency should assist Appellant more in acquiring appropriate housing. The trial court also noted that Appellant was argumentative and asserted that she could take care of things on her own but failed to follow through. The trial court expressed concern about the fact that Appellant had married a convicted sex offender but ordered DHS to provide proof that the husband posed a danger to the children. Finally, the judge instructed Appellant to visit her children, to continue to look for appropriate housing, to regularly attend counseling, and to provide proof of any support payments that she made.

An emergency hearing was conducted on January 15, 2002, after the Garcias notified DHS that they were no longer willing to have custody of Appellant's four children. According to the Garcias, they believed the custody situation was only going to be temporary. The trial court returned custody to DHS and the children were placed in foster care.

A review hearing was held on February 19, 2002. Janet Bledsoe, the attorney *ad litem*, reported that the two oldest children had been receiving counseling since being placed in foster care. The court was also given notice that Appellant's husband had been arrested on a parole violation and would probably be incarcerated for six months. The court discussed the need for Appellant to obtain adequate employment and suitable housing. The trial court cautioned Appellant that six months had already elapsed and that it was not sufficient under the law that she simply attempt to remedy the deficiencies but that she had to actually accomplish the goals established in the case plan. At the conclusion of the hearing, the court determined that DHS was making reasonable efforts to

ensure reunification. It ordered counseling for the two oldest children to continue and ordered that efforts be made to ensure that S.S. wore her glasses. The trial court reiterated the requirements Appellant had to satisfy under the case plan.

The next review hearing was held on May 7, 2002. The attorney *ad litem* reported that she had met with all four of Appellant's children, and only the two oldest children were mature enough to express their desires for the future. According to the *ad litem*, the two oldest children indicated that they would like to be returned to their mother. DHS requested that the next hearing be a permanency planning hearing. The trial court reviewed an evaluation of Appellant, noting that she had been diagnosed as suffering from major depression. It reminded her that the children had been out of the home for almost one year and that if she failed to make substantial progress, she faced losing her parental rights.

On August 13, 2002, the trial court held a permanency planning hearing. At this hearing, Miguel Nava appeared for the first time and claimed to be the father of the two youngest children, J.N. and M.N. Counsel was appointed to represent him. Also at this hearing, Appellant's parents sought to intervene in the case so that they could adopt the children if Appellant's parental rights were terminated. DHS objected to the intervention on the basis that the grandparents had previously indicated that they were physically and financially unable to care for the children. The trial court granted the motion to intervene and ordered DHS to conduct an assessment of the Camarillos' home. A termination hearing was then scheduled for November 12, 2002.

Appellant requested a continuance of the termination hearing, which was ultimately held on December 30, 2002. Appellant appeared and testified that she had been living in a three bedroom, two bath apartment in Siloam Springs for approximately five or six months. Living with her was her husband, who had recently been released from prison. Appellant admitted that as part of her husband's parole conditions he could not have unsupervised contact with minor children. Appellant also testified that she had recently been employed at Dayspring, earning $7.50 per hour and that her take-home pay had been approximately $271 per week, but that she was currently laid off until January 6, 2003. Once she returned to work, Appellant would be working from 6:00 a.m. until 4:00 p.m., but her mother had agreed to take care of the children while she was at work.

With regard to her requirements under the case plan, Appellant testified that she completed parenting classes. Appellant also stated that she visited her children often but admitted to missing some of the scheduled visits. According to Appellant, she would sometimes give her children money or small gifts during her visits with them. Appellant testified that she was consistently taking medication for her depression and had been for approximately four months. Appellant also stated that she saw her counselor, Megan Lescher, a few days before the hearing but could not recall the last time she saw her before that. According to Appellant, she had been on a waiting list to see a counselor.

Appellant admitted that Miguel Nava was the father of her two youngest children. She stated that they had never been married, but lived together until April of 2001. At that time, they separated after Nava stabbed Appellant in front of the children. Appellant stated that Nava had little contact with the children following the separation but admitted that he had provided some financial support. Appellant also acknowledged that Jesus Saucedo was A.S.'s father and stated that he was dead. She further testified that Raul Marcias, S.S.'s father, had been deported to Mexico.

Jeff Bland, Abie Cox's parole officer, testified that Cox had been on parole since October 2002 and would be until 2006. According to Bland, Cox was not to have unsupervised contact with minors, was to avoid high-risk situations, and abstain from alcohol consumption. Bland stated that he cautioned Appellant that she needed to carefully consider allowing Cox into her home since she was trying to regain custody of her children but that Appellant insisted that she wanted him to move in with her. Finally, Bland stated that since his previous parole violation, Cox had complied with his parole conditions.

Megan Lescher, Appellant's counselor at Ozark Guidance, testified that she first counseled Appellant in January 2001, when she came in and expressed concern about her son A.S. According to Lescher, Appellant had a "flat affect," cried and was despondent, reported having nightmares, and seemed to be detached. After evaluating her, Lescher opined that Appellant was suffering from major depression, borderline personality traits, and post-traumatic stress disorder due to a history of physical and sexual abuse. Lescher stated that Appellant had been sporadic in seeing her, initially attending two or three sessions and then not coming at all for a while. In fact, when Appellant came in for her appointment immediately before the termination hearing, it was

the first time Lescher had seen her since February 2002. According to Lescher, Appellant would start feeling better and then stop taking her medication and fail to come to appointments.

At her most recent appointment, Appellant reported to Lescher that she had been employed for six months and was taking her medication for depression. Lescher noted that Appellant did not appear to be depressed and had stabilized since she last saw her. Based on this information, Lescher opined that Appellant's prognosis was much better than she initially anticipated, as long as Appellant remained on her medication. On cross-examination, Lescher admitted that she had not personally witnessed Appellant's recent progress and could not state how she would function with four small children. Lescher also admitted that Appellant had not been consistent in the past with taking her medication.

Don Beckman, also a counselor at Ozark Guidance, testified about his work with A.S. and S.S., whom he started counseling in February 2002, when they began experiencing difficulties after being separated from their mother and placed in foster care. According to Beckman, he diagnosed A.S. as suffering from mood disorder. He worked with him until May 2002. During that time, Beckman found it difficult to engage A.S., who often refused to talk to him. According to Beckman, A.S. made little improvement in the four months that he saw him. Beckman opined that it would be best for A.S. to be in a structured environment that would allow him to feel safe and secure. Beckman also testified that he counseled S.S. until August and that she did show improvement. He noted that the biggest improvement with S.S. occurred after she underwent surgery to correct her crossed eyes, which improved her vision. Beckman opined that S.S. also needed a structured environment.

Tina Rushing, a licensed social worker, testified that she had worked with A.S. since July 2002, when he was placed in foster care in Little Rock. According to Rushing, A.S. exhibited signs of depression, withdrawal, anxiety, and emotional sensitivity. She worked with him on ways to verbalize his feelings instead of withdrawing. She also explained that A.S. was seeing an individual therapist for help in dealing with anger issues resulting from his placement in foster care. She also testified that A.S. suffered from a learning disability that affected his reading and spelling and that he was receiving resources to help him with that disability. Rushing stated that Appellant visited A.S. once in October 2002 and that the visit went well. A.S. was glad to see his mother but

told her that he was upset with her and did not understand why he was in foster care. Finally, Rushing testified that A.S. needs structure, consistency, and permanency and also needs to be able to continue counseling to address past environment issues. She also opined that while A.S. had expressed hope that he would be returned to his family, he would be able to cope if his mother's parental rights were terminated. His main concern regarding termination was the issue of what would happen to his siblings.

Lee Wade, a counselor with Ozark Guidance, testified about his work with J.N., which primarily consisted of play therapy. Wade began working with J.N. in May 2002. According to Wade, when he initially began working with J.N., the child exhibited controlled but aggressive play. He stated that J.N. was rigid, cautious, guarded, anxious, and that his play was not developmentally appropriate. He also startled easily. During the course of treatment, which lasted approximately eight months, Wade saw significant improvements in J.N., as he displayed more confidence and less aggression. Wade opined that he did not believe terminating Appellant's parental rights would cause significant trauma for the child.

Near the conclusion of the hearing, Jennifer Graham, the DHS caseworker for Appellant and her family, testified. According to Graham, since the children had been taken into protective custody, A.S. had been in seven different placements, S.S. had been in four different placements, and J.N. and M.N. had each been in four different placements. She stated that the services provided by DHS included transportation services, counseling referrals, family visitation, medical, dental and vision care, and educational services. Graham explained that prior to the children coming into DHS's custody, the Department had opened a protective services case for the family on May 29, 2001, based on a lack of supervision. According to Graham, the Department had not attempted any trial placement with the parents in this case. She noted that Appellant had failed to maintain suitable housing throughout the case and, thus, a trial placement was not appropriate. She admitted that Appellant had been in her current residence since August 5, 2002, and that Graham had visited her there three times. On the first visit, there were two men at the residence, and Appellant told her that her male cousin was living with her. The last time Graham visited, Appellant's husband was living with her.

With regard to Appellant's contact with her children, Graham testified that she attended most weekly visitation sessions but

was often late in arriving. On those visits that she missed, Appellant would claim a work interference or lack of transportation. Graham was unaware of Appellant ever requesting transportation to any of the visits, except to visit A.S. in Little Rock on one occasion. Graham also testified that Appellant was fairly consistent in bringing the children small gifts when she visited them but that she was not aware of Appellant paying any child support.

Graham opined that based on Appellant's past history, her recent employment and housing were not sufficient proof of stability. She noted that the children had been out of the home for sixteen months and during that time had never been returned to Appellant. Graham did not believe that there were any services that DHS could provide that would facilitate reunification in a short period of time. Graham did state, however, that she believed Appellant would continue to cooperate if the goal of reunification was continued based on her efforts of the last month. According to Graham, Appellant had completed the case plan in all categories except stability. Graham stated that in her opinion adoption was the best option for the children, not reunification. She stated that someone had expressed an interest in adopting all four children. She concluded by stating that the Department's recommendation was for termination of Appellant's parental rights, with the goal of the case plan being changed to adoption.

Following Graham's testimony, counsel for Nava, father of J.N. and M.N., moved for a directed verdict and requested that the court turn over custody of the two youngest children to him. The Department objected on the basis that the children had been out of the home in excess of twelve months and that Nava had failed to make any support payments. DHS took the position that it would not be in the best interest of the children to be placed in the custody of their father. The trial court noted that DHS failed to properly serve Nava for the dependency-neglect hearing and, thus, there had been no determination as to him in that regard. Thus, according to the trial court, without a prior determination of dependency-neglect, it would be inappropriate for it to terminate Nava's parental rights to J.N. and M.N. The trial court noted, however, that Nava was not an appropriate custodian for the two children and ordered that they remain in DHS's custody until a hearing could be held to determine Nava's rights to the children.

The trial court then announced from the bench that it was terminating Appellant's parental rights to all four children. The trial court noted that it believed Appellant loved her children, but

that she had been in and out of their lives for years. The court
further pointed out that she lacked stability and permanence. A
written order was entered on February 7, 2003. In that order, the
trial court terminated Appellant's parental rights, as well as any
rights of the fathers of A.S. and S.S. The trial court opined that
DHS had proved by clear and convincing evidence that termina-
tion was in the best interest of the children. This conclusion was
based on several factors, including: (1) the children had been out of
the home for at least twelve months and that despite meaningful
efforts by DHS to rehabilitate the home and correct the conditions
caused by removal, those conditions had not been remedied; (2)
Appellant failed to provide meaningful contact or support with the
children; and (3) Appellant manifested an incapacity or indiffer-
ence to remedy the conditions that led to the removal of her
children.

■ Appellant appealed the order of the trial court to the
court of appeals in *Camarillo-Cox v. Arkansas Dep't of Human Servs.*,
87 Ark. App. 35, 185 S.W.3d. 133 (2004). The court of appeals
reversed the order of termination on the basis that none of the
grounds warranting termination were supported by clear and
convincing evidence. In so holding, the court of appeals relied
primarily on the fact that while Appellant previously failed to
comply with the case plan, during the five-month period from the
permanency planning hearing of August 13, 2002, until the
termination hearing of December 30, 2002, Appellant "showed
significant improvement and met nearly all of the case plan
requirements." *Id.*, at 46, 185 S.W.3d at 141. DHS petitioned this
court for review. When we grant review following a decision by
the court of appeals, we review the case as though it had been
originally filed with this court. *Porter v. State*, 356 Ark. 17, 145
S.W.3d 376 (2004).

On appeal, Appellant argues that the trial court's order
terminating her parental rights was not supported by clear and
convincing evidence and thus should be reversed. She avers that
she remedied the conditions that caused her children to be
removed from her home. Moreover, she argues that she did not
wilfully fail to provide meaningful support or to maintain mean-
ingful contact with her children. DHS counters that there was
clear and convincing evidence supporting termination. We agree.

■ In cases where the issue is one of termination of
parental rights, there is a heavy burden placed upon the party

seeking to terminate the relationship. *Trout v. Arkansas Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d 486 (2004); *Ullom v. Arkansas Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 204 (2000). Termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Crawford v. Arkansas Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997). Parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). On appellate review, this court gives a high degree of deference to the trial court, which is in a far superior position to observe the parties before it. *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001); *Davis v. Office of Child Supp. Enforcem't*, 341 Ark. 349, 20 S.W.3d 273 (2000).

██ Pursuant to Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2002), an order terminating parental rights must be based upon clear and convincing evidence. *See also Larscheid v. Arkansas Dep't of Human Servs.*, 343 Ark. 580, 36 S.W.3d 308 (2001). Clear and convincing evidence is that degree of proof that will produce in the factfinder a firm conviction as to the allegation sought to be established. *Baker v. Arkansas Dep't of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Dinkins*, 344 Ark. 207, 40 S.W.3d 286. In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Baker*, 340 Ark. 42, 8 S.W.3d 499.

The question now before us is whether the trial court clearly erred in finding that there was clear and convincing evidence of facts warranting termination of parental rights. In the present case, the trial court terminated Appellant's parental rights pursuant to section 9-27-341 based on three different factors: (1) the children had been out of the home for at least twelve months and that despite meaningful efforts by DHS to rehabilitate the home and correct the conditions caused by removal, those conditions had not been remedied; (2) Appellant failed to provide meaningful contact

or support with the children; and (3) Appellant manifested an incapacity or indifference to remedy the conditions that led to the removal of her children.

With regard to the first factor, it was undisputed that the children had been in the custody of DHS for sixteen months. Each child had been in multiple placements, most notably A.S. who had been in seven different placements in that time period. DHS continued to offer services to Appellant; yet, it was not until the end of this case, with the termination hearing looming near, that Appellant began to take active steps to comply with the case plan. The testimony acknowledged that Appellant had recently maintained housing and employment. This same testimony revealed, however, that the recent improvements did not negate Appellant's history of instability. Notably, during her testimony, Graham, the DHS caseworker, admitted that Appellant had complied with most of the components of the case plan but had done so only recently. She stated that Appellant had not applied consistent efforts in completing requirements set forth by the court or the Department. She also testified that while Appellant had recently been employed, she was currently laid off until the first of the year. She further explained that Appellant's employment was obtained through a temporary agency.

In *Dinkins*, 344 Ark. 207, 40 S.W.3d 286, this court noted that, where the mother had been receiving services for two years and had still not managed to consistently comply with her case plan, the termination of parental rights was appropriate to effectuate the intent of the statute. In so concluding, this court gave due deference to the trial court, which had "heard and observed [the] witnesses first-hand." *Id.* at 215, 40 S.W.3d at 293. Likewise, we must afford the trial court in this case with the same deference. In short, there was ample evidence to support the trial court's conclusion that Appellant failed to remedy the situation that led to the removal of her children.

As to the trial court's finding that Appellant failed to provide significant material support and to maintain meaningful contact, it was also supported by clear and convincing evidence. There was testimony that Appellant sometimes gave the Garcias money to help with the support of her children. The trial court, however, at the November 20, 2001, review hearing, admonished Appellant to provide documented evidence of such support. Nothing in the record indicates that such evidence was ever

provided. Moreover, there is nothing in the record indicating that Appellant ever made any type of support payments after the children left the Garcias and were placed into foster care. With regard to the issue of meaningful contact, DHS testified that Appellant did attend most of her weekly visitations with the children, but there was also testimony that she missed several visitations.

■ Finally, the third basis found by the trial court to support termination was an incapacity or indifference to remedy subsequent issues. Again, there was clear and convincing evidence to support this conclusion. First, after her children had been taken from her, Appellant married a convicted sex offender. She defended her husband on the basis that his crime was merely having intercourse with a fourteen-year-old girl when he was seventeen. Regardless of how his offense is characterized, the fact remains that he was a convicted sex offender who, as a condition for his parole, could not have unsupervised contact with minors. Appellant first testified that she would supervise the children and that they would not be alone with Cox. Later, though, Appellant testified that she would force Cox to move out of her home in order to regain custody of her children. The trial court was in the best position to weigh the credibility of this conflicting testimony.

Moreover, while there was evidence that Appellant was striving to maintain more stable employment, the fact remains that at the time of the termination hearing she was laid off work, and when she did work, she obtained the jobs through a temporary agency. Finally, while Appellant had been on her medication for several months, Graham testified that Appellant had a history of taking the medicine for a while until she started feeling better and then would stop taking it.

■■ The bottom line is that the evidence was clear that these children needed a permanent and stable environment. The attorney *ad litem* representing them stated that it was her position that it was in the best interest of the children for Appellant's rights to be terminated. She noted that the children had been in foster care for a long period of time and needed permanency in their lives. While there was evidence that Appellant was complying with her case plan, we cannot ignore that her compliance did not begin until the eleventh hour. In considering this, we are mindful of the purpose of the termination-of-parental-rights statute, found at section 9-27-341(a)(3). It provides:

> The intent of this section is to provide permanency in a juvenile's life in all instances where the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective.

Thus, these children should not be forced to remain in foster care for an indefinite period of time while their mother repeatedly fails to heed the orders of the trial court regarding compliance with her case plan. The overwhelming testimony in this case supports a conclusion that these children need permanency and stability in their life, and their mother was either unwilling or unable to provide those things.

In *Jefferson v. Arkansas Dep't of Human Servs.*, 356 Ark. 647, 158 S.W.3d 129 (2004), this court upheld the trial court's termination of parental rights where the mother had been evicted from her home, was frequently unemployed, was forced to rely on relatives for assistance, was inconsistent in attending therapy sessions, and failed to follow the court's orders. In light of these facts, this court held that the mother "manifested an incapacity or indifference to correct the conditions that led to [the child's] removal from her home." *Id.* at 664, 158 S.W.3d at 140.

Moreover, in the recent case of *Trout*, 359 Ark. 283, 197 S.W.3d 486, this court rejected the mother's contention that it was error for the trial court not to consider the progress that she had been making immediately before the termination hearing. In so doing, this court pointed to evidence that the children had been out of the home for two years, and for much of that time, the appellant failed to comply with the requirements of her case plan. This court held that "Amanda's persistent failure to comply with the court's orders demonstrated that she was either incapable of correcting the problems or indifferent to the need to do so." *Id.* at 295, 197 S.W.3d at 494.

As this court discussed in *Jefferson* and *Trout*, evidence that a parent begins to make improvement as termination becomes more imminent will not outweigh other evidence demonstrating a failure to comply and to remedy the situation that caused the children to be removed in the first place. Here, Appellant's argument that there was no clear and convincing evidence to support the termination of her parental rights is without merit. Accordingly, the order of the trial court is affirmed; the court of appeals is reversed.