Cite as 2022 Ark. App. 57

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-21-411

| | |
|---|---|
| NITSA GASCOT<br><br>APPELLANT<br><br><br>V.<br><br><br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILDREN<br><br>APPELLEES | Opinion Delivered February 9, 2022<br><br>APPEAL FROM THE WASHINGTON<br>COUNTY CIRCUIT COURT<br>[NO. 72JV-20-25]<br><br><br>HONORABLE STACEY A.<br>ZIMMERMAN, JUDGE<br><br>AFFIRMED |

**RAYMOND R. ABRAMSON, Judge**

Nitsa Gascot appeals the June 1, 2021 Washington County Circuit Court order terminating her parental rights to her minor children, N.G. (DOB: 04-21-17) and E.G.-B (DOB: 02-11-19). On appeal, Gascot argues that the evidence is not sufficient to prove statutory grounds or that termination of her parental rights was in the children's best interest. For the following reasons, we affirm.

This case began when the Arkansas Department of Human Services (DHS) removed N.G. and E.G.-B from Gascot's legal and physical custody on January 7, 2020, due to allegations of failure to supervise, hazardous living conditions, and failure to protect.

The conditions that caused removal began when the Springdale Police Department contacted DHS on January 7, 2020, and reported that N.G., who was less than three years

old at the time, and eleven-month-old E.G.-B had been found unattended at the home. The building manager found the children locked in a back bedroom when the manager entered the apartment to perform pest control. Extensive amounts of trash were in the apartment, the room the children were locked in contained a half-full bathtub and another container of water, and the floor was soiled with urine. The manager said the children appeared to be hungry, so she fed N.G. Cheetos and she gave E.G.-B some baby food that she found in the cabinet. She further stated that she could find only one baby bottle, and it was caked with old milk.

Caseworkers could not find clothes for the children that were not soaked with urine. When Gascot appeared, the police officers arrested her for endangering the welfare of minors. On February 27, Gascot stipulated to the finding of dependency-neglect for both children: specifically, the children were locked in a bedroom and were left alone at home without proper supervision. The children had access to a bathtub filled with water, and the environmental conditions were unsafe for the children. The home was not safe and appropriate, and there was no legal caretaker for the children because Gascot had been arrested.

The circuit court set concurrent goals of reunification and adoption and ordered Gascot to cooperate with DHS, keep DHS informed of her whereabouts, participate in counseling, refrain from using drugs and alcohol, submit to random drug screens, obtain and maintain stable housing and employment, maintain a safe and clean home, and demonstrate an ability to protect the children from harm. In a review hearing on June 25,

the court found that Gascot was in partial compliance with the case plan. While she was visiting with the children, maintaining contact, and attending counseling, she did not have stable housing or employment. The court changed the goal of the case to termination of parental rights and adoption at a permanency-planning hearing on November 19.

The court made the following findings in support of the goal change:

> The mother has not complied with all of the court orders and the case plan. Specifically, the mother does not have stable housing and has not maintained stable employment. The testimony today is clear that mother quit counseling for 3–4 months, as the mother testified that she did not give her new phone number to the counselor. The mother is credible when she says she loves her children. However, the Court does not believe that she can meet the children's basic needs, nor her own needs, including her own mental health needs. The mother has been distraught throughout the hearing, and has been unable to control her emotions, and that is something that counseling would have helped her with. The mother does not have the skills to meet these children's needs. The testimony today is that the mother chose to move out of this area because housing is cheaper, yet she drives to Fayetteville for work. The testimony is that she has missed visits because her car conked out. The testimony is also that the mother requested to have Zoom visits with the children, in lieu of in-person visits. The Court finds that it is terrible to request Zoom visits, instead of in-person visits. Further, the testimony of Ms. Oliver is that when the mother does have Zoom visits, she does not focus on the children and that on one occasion the mother was walking down the aisles at Lowe's and not paying attention to the children during the video visit. Also, Ms. Oliver testified that if [N.G.] is unable to attend a visit, the mother forgoes her visit with [E.G.-B]. The mother has not made measurable, sustainable, and genuine progress towards alleviating or mitigating the causes of the juveniles' removal from the home and/or completing the court orders and requirements of the case plan.

On April 1, 2021, the court held another permanency-planning hearing and reiterated the sole goal of adoption. The court made findings similar to those in its November 19, 2020 order:

> It is good that the mother has a home, but the Court does not find that the mother makes enough money to meet the children's basic needs. The mother has no daycare

3

plan in place for the children. The mother does not have a safe and appropriate plan, and that is not just because the children are not on a daycare waiting list. The mother works in Northwest Arkansas and lives in Fort Smith. The court has no confidence that the children would be safe with the mother today.

On April 29, 2021, approximately fifteen months after the children's removal, the circuit court held a termination-of-parental-rights hearing.[1] Rashonda Graham, a DHS caseworker, testified that she had not heard from Gascot since the last court hearing. Graham had no information as to whether Gascot's income had changed. Graham testified that DHS still believed Gascot needed support and assistance in order to take care of the children. Graham was aware that Gascot lived in Fort Smith and worked in Springdale but did not know Gascot's work schedule. Graham testified that Gascot had stable housing, was participating in counseling again, and had passed all drug screens. Graham replied no when asked if she had any concerns about Gascot's living in Fort Smith but working in Springdale. Graham further testified that the children are adoptable and that they would be subjected to physical and emotional harm if returned to Gascot. Graham also testified that Gascot had never been able to reach a point where unsupervised visitation was possible.

Gascot testified at the hearing. She stated that she had put the children on a waiting list for day care the day before the termination hearing. She testified the day-care worker told

---

[1]In both DHS's petition for termination of parental rights and the attorney ad litem's petition for termination of parental rights, it is noted that no putative parents have come forward to establish significant contacts with the children such that parental rights would attach. The termination order states, "This Court previously found that no putative fathers have come forward to establish paternity as to the juvenile, or otherwise demonstrate that they have significant contacts with the juvenile, and that putative rights have NOT attached." Therefore, the mother is the children's only parent.

her it would be "two weeks" for N.G. and E.G.-B to be placed in day care. Gascot testified that she works in Springdale from 7:00 a.m. to 3:00 p.m. and that it takes her forty-five minutes to commute. Gascot testified that she earns $1,500 a month after taxes, her rent is $720 a month, her car payment is $90 a week, and her family helps her with other expenses. Gascot claimed her brother and sister-in-law would take care of the children if she had no day care. When asked why she believes her rights should not be terminated, her only response was that "they need to be with . . . their biological mother. Nobody understands this the way I do."

Gascot testified that she had recently been arrested for failing to appear in her criminal case and was paying $100 every two weeks in fines. Gascot requested Zoom visits in lieu of in-person visits because of her work commute. Gascot admitted her children were removed because she left them alone to go to work. Gascot again claimed that even though she was still alone, her brother was "moving to Fayetteville" and would be able to help her this time. Gascot claimed "everyone makes mistakes," and "I won't do those things anymore." At the conclusion of the hearing, the circuit court terminated Gascot's parental rights. Her timely appeal is now properly before our court.

Our standard of review in termination-of-parental-rights cases is well settled; we review these cases de novo. *Dinkins v. Ark. Dep't of Hum. Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Smithee v. Ark. Dep't of Hum. Servs.*, 2015 Ark. 506,

5

471 S.W.3d 227. A court must find that at least one statutory ground exists in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Supp. 2021). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992).

The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Hum. Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). In determining whether a finding is clearly erroneous, we give due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Dinkins*, *supra.*

In making a "best interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent. *Pine v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703. Adoptability is not an essential element but is rather a factor that the circuit court must consider. *Tucker v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1. Similarly, the potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine*, *supra*. The potential-harm analysis is to be conducted in broad terms. *Id.* It is the "best interest" finding that must be supported by clear and convincing evidence. *Id.*

6

On appeal, Gascot argues that the evidence is insufficient to support either of the two statutory grounds found by the circuit court: the "failure to remedy" ground codified at Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* and the "subsequent factors" ground codified at Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)*(a)*. Gascot's challenges are essentially requests for our court to reevaluate and reweigh the evidence and arrive at an outcome different from that of the circuit court. It is well settled that our court will not reweigh the quality of the evidence or credibility of witnesses. *Chaffin*, 2015 Ark. App. 522, at 3, 471 S.W.3d 251, 254.

The evidence is clear and convincing that Gascot failed to remedy the conditions that caused removal—specifically, her failure to protect and adequately supervise the children. The crux of Gascot's argument on appeal is that her rights were terminated due solely to abstract generalizations about her poor judgment or poor choices. We disagree.

Gascot's rights were terminated because she left her children alone in a dangerous environment so she could go to work, and after fifteen months of services, she still had not demonstrated that she could appropriately balance her work and family life in a way that did not endanger her children. The foregoing facts are clear and convincing evidence that Gascot failed to remedy the conditions that caused the children's removal: inadequate supervision and failure to protect.

Again, Gascot's argument is an attempt to recharacterize and rearrange the credibility and weight determinations of the circuit court. When reviewing conflicting testimony, however, the appellate court leaves credibility determinations to the circuit court and will

7

not substitute its judgment for that of the fact-finder to reach a different outcome. *Arazola v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 109, at 13, 573 S.W.3d 35, 42.

In this case, after fifteen months of services, Gascot still had not demonstrated that she could prioritize the children's safety and caretaking over her own personal choices. The condition that caused removal was Gascot's leaving her children unattended in dangerous conditions so she could go to work. Eleven months after removal, the court stated unambiguously, "[T]he court has no confidence that the children would be safe with the mother today."

At the termination hearing, after fifteen months of services, the court learned that Gascot had put her children on a day-care wait list only the day before the termination hearing. Gascot's lifestyle was still tremendously unstable at the time of termination. Gascot's income was inadequate to absorb the extra costs of having two children suddenly returned to her, and she was dependent on the graces of others for financial support. Gascot was still prioritizing her own choices above the safety and welfare of her children as demonstrated by her insistence on working in Fayetteville while living in Fort Smith and especially by her insistence on Zoom visitations simply to accommodate her work schedule.

Gascot also failed to appear for her criminal proceedings during the case and incurred even more financial obligations due to those poor choices. At the end of the case, Gascot was in the same position she was in at the beginning: prioritizing her own needs over those of her children. The court had no assurance that Gascot would not again leave the children in dangerous circumstances due to her unstable lifestyle. Because only one statutory ground

is needed, we affirm the termination of Gascot's parental rights on this ground alone. *See Barnes v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 618, 508 S.W.3d 917.

Gascot relies heavily on *Guthrey v. Arkansas Department of Human Services*, 2017 Ark. App. 19, 510 S.W.3d 793. However, *Guthrey* is readily distinguishable. In *Guthrey*, the fatal flaw was that the circuit court framed the very conditions that caused removal as Guthrey's "poor judgment." *Id.* at 7–8, 510 S.W.3d at 797–98. After identifying "poor judgment" as a basis for removal, the court did not cite any evidence beyond Guthrey's dishonesty and evasiveness to support a conclusion that Guthrey did not remedy the conditions that caused removal. *Id.* at 8–9, 510 S.W.3d at 798.

In this case, however, the court framed the conditions that caused removal quite clearly: failure to protect; inadequate supervision; and environmental hazards. When the court terminated Gascot's rights, it found, among other things, the following:

> Today, this case is not just about daycare. It's about mom's choices and her poor judgment. It's about mom's ability to demonstrate she can meet her children's basic needs and keep them safe from harm. She doesn't have a spot today for daycare for her kids lined up. She says that she has her brother, who can keep the children and they're moving to Fayetteville from Rogers. But how can I trust mom's testimony today when I don't believe that she's been credible in her testimony? . . . It's clear to me that mom continues to make choices that have led to her arrest. I don't think she thinks this situation with her kids coming into care was a big deal. It was just a mistake, she says.

The circuit court's use of the term "poor choices" was not a generalized or abstract statement based on something such as overall evasiveness as it was *Guthrey*. Here, Gascot's poor choices directly related to conditions that caused removal—her leaving the children unattended so that she could attend to her own desires and needs.

9

Gascot also cites *Duncan v. Arkansas Department of Human Services*, 2014 Ark. App. 489, in support of her appellate arguments. Duncan was reversed, in part, because our court held that Duncan's record of improvement established that she had remedied the conditions that caused removal—environmental neglect and domestic violence. *Id.* at 8. In *Duncan*, there was evidence that the mother had been paying her bills, had adequate food, and had been progressing in therapy on the domestic-violence issues. *Id.* at 8–9.

In the instant case, however, the only evidence of any effort to remedy the circumstances that caused the removal of Gascot's children was her placement of her children on a day-care waiting list one day before the termination hearing—after fifteen months of services. A child's need for permanency and stability will override a parent's eleventh-hour efforts to stave off termination. *Sharks v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 435, at 13, 502 S.W.3d 569, 578. Here, despite being aware for fifteen months that the circuit court's primary concern was her failure to protect and adequately supervise her children and her inability to arrange her work schedule in such a way as to not jeopardize their safety, Gascot did nothing until the day before the termination hearing to remedy this circumstance. And even then, it was still unclear when and if Gascot would be in a position to safely care for the children.

On the basis of the record before us, the evidence is clear and convincing that Gascot did not remedy the circumstances that caused removal—inadequate supervision and failure to protect—despite fifteen months of services from DHS. Gascot made no complaints during

the case regarding a lack of any services. Gascot waited until the day before the termination hearing before even taking a first step to obtain proper child care.

Arkansas law requires that a decision to terminate parental rights be grounded in an evaluation of the child's best interest. Arkansas Code Annotated section 9-27-341(b)(3)(A) provides that a court may enter an order terminating parental rights if it finds by clear and convincing evidence that it is in the best interest of the child. The best-interest determination includes consideration of the evidence supporting the specific grounds for termination. *Camarillo-Cox v. Ark. Dep't of Hum. Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005).

The best-interest standard also includes consideration of the following two factors: (1) the child's likelihood of adoption; and (2) the potential for harm from returning the children to the parents' custody. Ark. Code Ann. § 9-27-341(b)(3). These are not exclusive factors. There is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that the termination is in the best interest of the child. *McFarland v. Ark. Dep't of Hum. Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005).

There is also no requirement to identify the specific potential harm. In deciding whether to terminate parental rights, the circuit court has a duty to look at the case as a whole and ascertain how the parent has discharged his parental duties, whether the parent poses a substantial risk of serious harm, and whether the parent is unfit. *In re Adoption of K.M.C.*, 62 Ark. App. 95, 969 S.W.2d 197 (1998). The court's statutory-grounds findings are evidence relevant to the potential harm that the children would face if returned to Gascot's

custody. *Taylor v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 264, at 12 (finding that the same evidence that supported statutory grounds supported the potential-harm prong of the best-interest finding). Here, the potential harm Gascot posed to the children was clear: because Gascot waited until one day prior to the termination hearing to even put the children on a day-care waiting list and because of her unstable lifestyle and commute, the children would potentially end up in the same situation as at the beginning of the case—unattended, soaked in urine, and subject to a dangerous environment such as a bathtub full of water.

These findings were based on the court's observation of Gascot over fifteen months and how she took no action to remedy the two things that created the conditions that caused removal: her unstable lifestyle and her inability to obtain proper child care to accommodate her work schedule. The past actions of a parent over a meaningful period of time are good indicators of what the future may hold. *Sharks*, *supra*.

Finally, Gascot's attempt to cloud the issue by introducing a relative named in a CASA report—the paternal grandmother—is not well-taken. There is no indication in this record that this relative was ever considered for permanent placement in lieu of termination, and if so, Gascot never appealed any of the permanency-planning orders that set adoption as the sole goal of the case. *Clark v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 223, at 4–5, 575 S.W.3d 578, 581 (finding that mother was not required to appeal permanency-planning order to preserve a relative-placement issue because the goals in the permanency-planning order were concurrent). Further, as noted previously, the circuit court found in both the order entered after the permanency-planning hearing and the order terminating Gascot's

parental rights that the putative fathers in this case, Darwin Irizarry and Gregory Brown, had not presented evidence that either had established significant contacts with N.G. or E.G.-B; therefore, putative parental rights never attached. As such, the paternal grandmother could not be considered a relative for placement purposes.

Here, the potential harm "weighs very heavily. . . in terminating appellant's parental rights." *Hayes v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 21, at 5–6. It was obvious that Gascot took no action to remedy the core issue in this case—leaving her children unattended while she commuted to jobs in other cities—until the day before the termination hearing, and even so, it was not clear if Gascot had obtained the stability in her life to have the children returned without exposing them to more potential harm. Thus, as a result of Gascot's incapacity to remedy the issues that led to the adjudication of dependency-neglect, this is not a case in which the circuit court should have leaned toward less restrictive alternatives to termination of Gascot's parental rights.

There was no clear error in the circuit court's decision that adoption and termination of parental rights was the appropriate outcome for these children, and there are no grounds for a "firm conviction" that the circuit court made a mistake in terminating Gascot's parental rights. Accordingly, we affirm.

Affirmed.

BARRETT and BROWN, JJ., agree.

*Dusti Standridge*, for appellant.

*Andrew Firth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.