SLIP OPINION



Cite as 2016 Ark. App. 618

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-16-750

|  |  |
|---|---|
| | **Opinion Delivered** December 14, 2016 |
| ERICA BARNES and TYSHON HALL<br>APPELLANTS | APPEAL FROM THE PULASKI<br>COUNTY CIRCUIT COURT,<br>ELEVENTH DIVISION |
| V. | [NO. 60JV-15-15] |
| ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES and MINOR<br>CHILDREN | HONORABLE PATRICIA JAMES,<br>JUDGE |
| APPELLEES | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Erica Barnes appeals from the June 9, 2016 order of the Pulaski County Circuit Court terminating her parental rights to her five children, E.B. (DOB 1-15-02), Z.R. (DOB 9-24-06), T.H.1 (DOB 6-20-12), T.H.2 (DOB 8-2-13), and E.H. (DOB 1-1-15). Barnes argues on appeal that the evidence was insufficient to terminate her parental rights. Appellant Tyshon Hall, the father of T.H.1, T.H.2, and E.H., also appeals the June 9, 2016 termination order. He contends that the trial court erred in terminating his parental rights because DHS failed to properly plead the potential-harm prong in its petition and the evidence was insufficient to support the termination. We find no error and affirm.[1]

---

[1]The court also terminated the parental rights of E.B.'s and Z.R.'s putative fathers; however, they are not parties in this appeal.

SLIP OPINION

This case began after Barnes tested positive for cocaine at the birth of E.H. On January 2, 2015, Barnes tested positive for both cocaine and oxycodone. Barnes had also tested positive for cocaine at her prenatal visit on December 22, 2014. Arkansas Department of Human Services (DHS) took a seventy-two hour hold on the children on January 2, 2015. DHS filed a petition for emergency custody on January 5, 2015, and the court issued an ex parte order for emergency custody that same day. On February 11, 2015, the children were adjudicated dependent-neglected as a result of parental unfitness and neglect based on Barnes's stipulation of cocaine use at or near the time of E.H.'s birth and E.H.'s positive cocaine screen at the time of birth. The order also indicated that the court accepted Barnes's case as "Zero to Three." In the Zero to Three review order of July 13, 2015, the court noted that Barnes had tested positive for alcohol on June 12 and June 26. The court ordered unsupervised visits in Barnes's home with the children on October 5, 2015.[2]

The permanency-planning hearing took place on December 9, 2015. In the order entered on the same day, the court found that Barnes "has checked off boxes, but there are still serious problems with [her] stability and judgment." The order noted in pertinent part that

> TONI HANSBERRY testified that mother has made progress towards reunification. She completed treatment, has a sponsor, and has participated in NA/AA, random drug screens, and visitation. She has completed counseling and is employed. Mother was recently evicted from her home; she has located a home in North Little Rock. She has outstanding bills in her name, so she cannot get the utilities in her name, DHS learned this on November 4, when they attempted to visit mom's home during a visit. Mother was not there, and the landlord told Ms. Hansberry what happened. Mother

---

[2]Z.R. was not included because she was in an acute placement, and there is no indication that E.B. was included.

2

had the kids at McDonalds. Ms. Hansberry talked to mother; mother denied owing that much money, but she said she did owe some. Because of this, the visits returned to the DHS office. The landlord told Ms. Hansberry that mother owed $3000 in rent. Mother owes $1600 in electric; $300 in water; and she did not have an amount for gas. She had utilities in her old place in different people's names. She is trying to get the lights on in the uncle's name. Mom works for Jason's Deli. That is a new job. [Z.R.] is not doing well at Centers; she is aggressive. . . . [E.B.] was doing well until another teen was placed in the home; then he started being disrespectful and skipped classes. . . . Mother has visited with all but [Z.R.] recently. Mom recently started visiting her at Centers. Mother still needs assistance with redirection and helping with younger kids. [E.B.] sometimes does not want to come to visits because he does not want to help with the younger kids. Four out of the five children have some type of behavior problem. Mother works the services, but she does not have the capability to parent all five kids. There are budgeting concerns, as well. . . . Mother has had one therapy session with [Z.R.] . . . Mother had been served with eviction notices several times before November 4. Mother moved from Rose City to another place in NLR; she now works in Little Rock. At visits, she pays attention to the kids, but she is also on the phone. As the visits wind down, she starts getting on the phone. Mother said she has little support. DHS just received the psychological evaluation for mother today. The psychological was done in April. Housing and ability to parent the children are the main concerns. Each time mother has moved, utilities and/or apartment has been in someone else's name. That is part of her history. Jerome Martin is using his name for utilities, but he also had an old bill that mother had to pay to get to use his name. Another friend may let mother put gas in her name. The Hall grandmother is letting mother live with her; mother has a friend here today (Jasmine Clarks) that helps with transportation. Mother said she had "other bills" like a cell phone bill, a light bill, bus, and bills from where she goes to the emergency room. She has had one hair follicle; they requested another but it has not been approved. She did that at the beginning of November, and again after the staffing[.]

The court changed the case's goal to adoption and termination of parental rights. It noted that Barnes's continued poor decision making was a present problem.

DHS filed a petition for termination of parental rights on January 11, 2016. DHS listed three grounds for termination against Barnes: (1) the "failure to remedy" ground,[3] (2)

---

[3]Ark. Code Ann. § 9–27–341(b)(3)(B)(i)*(a)* (Repl. 2015).

the "subsequent other factors or issues" ground,[4] and (3) the "aggravated–circumstances"

ground.[5]  DHS listed four grounds for termination against Hall: (1) the "subsequent other

factors or issues" ground, (2) the "aggravated–circumstances" ground, (3) the "abandonment"

ground,[6] and (4) the "sentenced–in–a–criminal–proceeding" ground.[7]

The termination hearing took place on March 7and April 21, 2016.  Dr. Paul Deyoub

testified that he evaluated Barnes and diagnosed her with cocaine use.  He said that she had

borderline intellectual functioning due to a 74 IQ, and that she was a child–abuse perpetrator

because E.H. was born with cocaine in his system.  Dr. Deyoub opined that due to Barnes's

cocaine use, she needed individual therapy, residential drug treatment, parenting classes, an

adequate place to live and means of employment and support, and evidence of a stable

environment for at least six months.  On cross-examination, Dr. Deyoub stated that Barnes

and Hall had a very unstable relationship.  He testified that Hall had failed to show up twice

for his psychological appointment in this case.

Barnes testified that she participated in "quite a few services throughout the course of

this case," including parenting classes, therapy with Z.R., a psychological evaluation,

outpatient treatment at RCA, AA meetings, and the Zero to Three Program before it ended.

She admitted that she tested positive twice in June for alcohol; however, she denied coming

to visits under the influence of alcohol.  According to Barnes, the positive alcohol screens

---

[4]Ark. Code Ann. § 9–27–341(b)(3)(B)(vii)*(a)*.

[5]Ark. Code Ann. § 9–27–341(b)(3)(B)(ix)*(a)(3)(A)*.

[6]Ark. Code Ann. § 9–27–341(b)(3)(B)(iv).

[7]Ark. Code Ann. § 9–27–341(b)(3)(B)(viii)*(a)*.

were from her drinking a day or two before the screens. She testified that she currently resided at 703 West 23rd Street in North Little Rock with Hall.[8] She stated that she had lived there since January 7, 2016. She testified that it was her plan to remain with Hall. She said that she had gotten a house on Haywood in November but that she never moved into it because she could not get the lights turned on. She stated that she subsequently moved in with Hall's mother until she got herself together. Barnes testified that she lived in an apartment located at 7414 Mabelvale Pike in Little Rock when the case first opened. She denied being evicted from the apartment, but instead contends that she left after there was a shooting across the field from her apartment. She said that she did not believe that she owed the landlord of the apartment $3,000, but guessed that she did owe him about $1,500. She stated that she is currently employed at Jason's Deli where she has been employed for nearly seven months. She said that prior to that, she worked at Family Dollar. She testified that she enjoyed unsupervised visitation with her three youngest children until around November.

On cross-examination, Barnes stated that she and Hall had not undergone couple's counseling although she had a battery conviction against Hall. She stated that she had been with Hall for six years but that she was unaware of any convictions he had during that time. She said that Hall went to prison during this time but that the reason "wasn't [her] worry at the time." She admitted that she made no effort to pay off her outstanding utility bills while she lived with Hall's mother. She stated that she had been unable to manage her rent and

---

[8]The utilities are in her mother's and Hall's names.

utilities for a couple of months. She testified that she makes $7.71 an hour at Jason's Deli and that she works approximately twenty-eight hours a week.

Hall testified that he was released from prison on January 4, 2016. He stated that he was placed in custody on April 2, 2015, due to probation revocations on underlying charges. He said that he was unable to participate in services while he was incarcerated but that he did take parenting classes, anger management classes, drug and alcohol treatment, and another class while in prison. He testified that he would be on parole until February 18, 2018. He stated that the residence he and Barnes shared had two bedrooms. He said that if all of the children were returned to them, two children would sleep in each room and E.H. would sleep in the living room with him.

On cross-examination, Hall denied having a positive drug screen on April 2, 2015, while at a criminal hearing. He stated that he received certificates for the classes he took while in prison but that he "left them all behind." He testified that he has had multiple probation revocations in the past five years. He stated that he had never been charged with assault against Barnes. He said that he was on call with Complete Staffing but that he had not been called for a job yet. He stated that he received financial assistance from his family.

On redirect, Hall stated that he pays bills with the income he receives from his family. He said that he works for his family's lawn service "under the table" and receives payment for that.

On re-cross, Hall stated that his payment varied depending on the service put in. He said that on average, he receives $60 to $70 a day. He testified that he saves his money and helps with the bills in the residence he shares with Barnes.

Upon examination by the court, Hall stated that he received payment for the days he worked. However, he said that he could still go to his parents for money if he was in a bind.

Toni Hansberry, the family service worker assigned to the case, testified that the children were removed after E.H. was born with cocaine in his system. She stated that the case was initially a Zero to Three case, which meant that there were the extra benefits of coming to court more frequently; additional counseling; the benefit of a visit coach who monitored the visitation and reported to DHS and the court; additional types of therapy; and overall, a more intensive and hands-on experience. She stated that Barnes enjoyed unsupervised visitation with her children until DHS learned that she had been served with an eviction notice in November. She said that Barnes subsequently moved to a house on Haywood, but that no home study could be conducted because the house did not have any utilities on. She stated that Barnes then moved in with friends and eventually began staying with Hall's mother. According to Hansberry, Barnes moved to another location and subsequently moved to the current location in North Little Rock. Hansberry stated that Barnes had been offered drug screens, supervised and unsupervised visitation, psychological evaluation, parenting classes, Zero to Three Program, individual therapy, outpatient drug treatment, drug-and-alcohol assessment, and bus passes. She stated that Barnes had completed the services offered by DHS. She said that Z.R. was in Centers from August to January and that during that time, Barnes participated in one therapy session and one visit. She stated that she was unaware of the reasons that prevented Barnes from participating more.

Hansberry stated that she did not have any contact with Hall before he was released from prison. She said that Hall did not start any services before going to prison. However,

7

SLIP OPINION

she stated that he did submit to a paternity test, which was positive for the three youngest children. She testified that Hall contacted DHS following his release, and he began to visit his children. She stated that a psychological evaluation had been scheduled but that it would be April before they could see him. Hansberry opined that it was in the children's best interest to have Barnes's and Hall's parental rights terminated.

On cross-examination, Hansberry testified that Barnes never indicated that she and Hall were planning on being a couple upon his release from prison. She stated that permanency, debt, and having a support system were all concerns DHS had for Barnes. Hansberry said that although Barnes completed some of the Zero to Three goals, she never completed stability. She stated that in 2012, there was an unsubstantiated referral concerning Barnes that was very similar to what came to light in 2014. Hansberry opined that the children could not be returned to Barnes and not be placed at risk of harm due to Hall's presence in the residence. According to Hansberry, it would be months before Hall could complete the services necessary to make it safe for the children to return. She also said that there would be some concerns about Hall's criminal history with respect to the safety of the children due to the serious nature of his criminal charges that involved weapons and drugs.

On cross-examination by Barnes's attorney, Hansberry testified that Barnes was required to maintain sobriety and stable housing. She stated that Barnes needed to be able to apply what she learned when interacting with the children. She further testified,

> In order for her to be reunified with her children she needed to stay in her home. She needed to have utilities on in her home. She needed to learn how to deal with the behaviors of her children without being instructed or prompted and assistance from other people. She has a son who has some problems and was having some problems in school, some educational issues. She has a daughter that has some severe behavior

issues.  She needed to get into therapy with her daughter so she can learn what's going on with her daughter, how to better deal with her daughter and how to be able to parent a child that has some special needs and behavior needs.  Although the children were out of her care for over a year, Ms. Barnes was afforded the opportunity to participate in services with her children.  She was to visit and participate in therapy, learning what's going on with your children, learning how to deal -- there's a difference.  I heard her testimony on how she did counseling with Z.R. , she did one counseling session.  It wasn't December until February.

I said the mother's instability and about taking care of her home, that she should have stayed in her home.  As for if I'm talking about the home where the shooting was, well, I don't know if there was a shooting, that's just what Ms. Barnes is telling us.  But she had that home and then she moved to another home and then that home didn't pan out and then she moved somewhere else and then she moved somewhere else.  So that's instability, she's not staying long enough where we can be able to -- the home that she moved in on Haywood Street, there was never any utilities there so that a home study could be conducted to see if there were any safety concerns in the home.  Then she moved in with Mr. Hall's mom and then she left there and then she moved to the home that she's in now.  So once she left her home on Mablevale she has had a pattern of instability in her living status.  She's had two homes, she had Mablevale and she's go the one she's in now, but she's only been there since January 7th.  She didn't got right from Mabelvale to this house.  She went from Mablevale to 490l Haywood.  She moved all of her personal things into the home. She never moved into the home because she could not get utilities on in the home.  She left that home and went to Mr. Hall's mother's home.  She left Mr. Hall's mother's home and then she went to the home that she is on West 23rd Street.  So that's four addresses that she's had.  She paid rent at the Haywood home, she paid the deposit and she moved her stuff in.  She never lived there but said that's where her residence was.

Hansberry stated that they were unable to provide Barnes with budgeting services because there was never a stable home to come to.  She stated that there was no cash assistance made to Barnes.  She also said that there were not any housing referrals made because DHS does not make housing referrals.  Hansberry testified that Barnes still needed redirection with parenting the younger children.

Upon cross-examination by Hall's attorney, Hansberry stated that Hall had submitted to requested drug screens.  She said that he had not had a new referral for individual therapy.

She stated that DHS did not make any new referrals while Hall was in jail so that his psychological evaluation could be conducted there. She also stated that there was no referral made for Hall to have a drug-and-alcohol assessment. She testified that since Hall was incarcerated during the time of the Zero to Three, he did not receive any additional counseling. She further stated that Hall was not offered any parent–child psychotherapy.

On redirect, Hansberry stated that no one had provided DHS a copy of the lease of appellants' current residence. She said that there was a possibility that the utilities would be disconnected if someone decided he/she no longer wanted them in his/her name. She stated that Barnes had not received domestic violence counseling or anything for anger management.

Danyetta Pride, an adoption specialist, testified that the children were adoptable. She stated that as a family group of five with all the behavioral, medical, and developmental issues, there were ten resources available. When the three youngest children are run as a group, there are 146 adoption resources. She stated that there are sixty-five adoption resources for E.B. alone. And she said that there are eighty-two adoption resources for Z.R. by herself. Pride opined that the children did not have issues that would be a barrier to adoption, although the older children had some behavior issues.

Matthew Gerek testified that hair follicle tests were performed on both appellants on February 25, 2016, and that they both were positive for cocaine.

Barnes testified that she felt bad and scared for E.H. when they tested positive for cocaine on January 2, 2015. She stated that she had taken steps to correct that situation. She said that she underwent a drug and alcohol assessment and that she completed outpatient treatment at RCA. She said that she started going to AA meetings and meeting with a

sponsor after she got out of treatment. She stated that she worked through the steps but that she still had to work on her amends. Barnes said that she underwent urine tests throughout the case and that they were all negative for drugs. However, she admitted that she tested positive for alcohol on two of the screens. She stated that she has not used alcohol since that time. She testified that she learned redirection and discipline in parenting class, which she successfully completed. She said that Dr. Deyoub performed a psychological evaluation on her and that she learned a lot about herself from the results. She stated that she underwent counseling to work on her anger management and other issues. She said that she works as a cashier at Jason's Deli, and that she trains the new hires. She stated that she left Family Dollar and went to Jason's Deli because it was hard for her to get home at night. She testified that she would like to own her own restaurant in the future. She stated that she had recently done a budget and had done "fantastic" with her bills lately. She said that the gas bill was now in her name and that the light and water bills were in Hall's name. She stated that she received no services from DHS for managing her money. Barnes testified that she and Hall lived together and that their relationship was going "good." She stated that he was currently employed at something like a deli.

On cross-examination by Hall's attorney, Barnes stated that Hall has helped support the household and her sobriety. She stated that they help keep each other clean. She said that Hall was very supportive when it came to visiting the children, and that she believed the children needed him in their lives. She also stated that Hall had expressed his love for the children to her.

On cross-examination by DHS, Barnes testified that she had not used alcohol since June 26, 2015. She stated that the last time she visited Z.R. was January 4 because she did not have a way to Fordyce for the visits. However, she stated that she calls and checks on Z.R. She said that she and Hall started dating in 2010. She stated that she never used cocaine with Hall although they both have a history of cocaine use. She said that her unsupervised visits were ended because she was evicted and that it was never reinstated because she did not have an appropriate and suitable home. She stated that although the hair follicle test shows that she was positive for cocaine in February 2016, she did not understand the positive result because she had not used cocaine since December 31, 2014.

Upon cross-examination by the attorney ad litem, Barnes stated that she was with Hall when he pled guilty to aggravated assault on October 26, 2010. However, she said that she was not with him in January 2011 when a revocation petition was filed against him and he was sent to jail for thirty days. She said she was with him in December 2013 when another revocation petition was filed and he was sentenced to ninety days in jail with fifty-two days jail credit. She also stated that she was aware of the revocation petition filed against Hall in December 2014, which subsequently resulted in him being imprisoned after he tested positive for drugs on April 2, 2015. She further testified

> I think having Mr. Hall as my partner and living with him is a good choice for my children as far as stability and a good example. He's a good example because of the things that he did, I mean, he got hisself [sic] together. I could see if he keep doing it and got out and was doing the same thing, then that would be a different thing. But as far as his children, he's a great father to his kids.
>
> As far as if I'm just completely ignoring the fact that he tested positive in a hair test in February of this year when I say that he's not doing that, well, I can't believe that, I don't believe that. I don't believe the hair test results.

Barnes stated that DHS did not help her figure out her finances and what needed to be done. She said that she did not have a payment plan for her light bill, water bill, or back rent. She stated that Hansberry conducted a home visit on February 10, 2016, and that at that time, the home was heated by gas stoves that had open flames in the front, which was not safe for toddlers. She also stated that at the time of the visit, a couch or sofa blocked the front door. Barnes stated that she had known since the beginning of March that her hair-follicle test was positive for cocaine. She said that she did not go into any treatment program after the positive screen as suggested by her drug and alcohol assessment as well as her psychological evaluation. When asked why her children should be returned to her, Barnes stated

> As for me telling the Court why I should get my kids back even though I haven't complied, well, I complied with everything like I said I haven't even touched a drug since 12-31-14; so I don't feel like I'm doing -- dealing with my recovery, but I don't feel like, you know, that should be a part of it because it's not true. I didn't say that I don't have a problem. I said I'm dealing with my recovery. I never said I didn't have a problem, I just said this wasn't true.

Hall requested that his parental rights not be terminated. He stated that he started visiting his children as soon as he was released from prison. He said that he had visited them every week, sometimes twice a week, since his release. He testified that prior to going to jail in April, he saw his children daily. He stated that he provided them with essentials as well as gifts for the holidays. He said that he had always been able to work and that, when his money was low, he received help from his family. He stated that although he was sentenced to thirty-six months' imprisonment for a revocation, he only served nine months. He said that since his release, he had been doing the best he could to get his children back home with him. He testified that he has tried to stay employed since his release and that he was currently

employed with Schlotzsky's, making $8.50 an hour. He said that he also helps his uncle with lawn services. He stated that he provided Barnes with transportation to meetings and that he also attended some meetings himself. He also said that he attends church. He testified that April 2, 2015, was the last time he used an illegal substance. He said that he did not understand how his hair follicle test was positive for cocaine. He stated that he was currently on parole and that there were no known revocations pending at the time. He said that he was unaware of any services DHS had asked him to do since his release. However, he stated that he had been drug screened and allowed visitation. He also said that DHS had visited his home and pointed out some health and safety concerns that needed to be fixed. He stated that he shut down the whole heating system and planned to get it fixed during the summer. He further testified:

> Today, I'm asking the Court to, you know, I'm really asking the Court for another chance of having rights to my kids because not only am I trying to better myself, but I'm trying to be here as well for them. I know I ain't the perfect person in the world, but I'm a good dad to all three of my kids. And if they walked in here right now, they'll know who I am and they will know who I'll be for the rest of their life so I'm trying to do my best, I mean–
>
> There's been some questions asked about whether it was a good idea for Ms. Barnes to get back with me after I got out of jail. I have done plenty to help support her. I mean, I have two vehicles of my own in my name, driver's license. And no matter what, I mean, relationship we go through things however it may be. I'm pretty sure everyone else have they -- well, that ain't got nothing to do with it. All I know is that I do what's best in my relationship, make sure that she gets everywhere she need to go no matter what time. She ain't got to do nothing. I'm going to provide for everything; so that's just me.

Upon cross-examination by DHS, Hall stated that his parole ends on February 18, 2018. He admitted that he had rules for parole and that he would "get a sanction" if he broke those rules. He stated that returning to prison was a possible sanction, "but they give you

chances." He testified that he had heard of other people having their parole revoked but that he did not have any intention of getting revoked. He continued, "I don't think I would go back into custody if DHS were to turn over the hair shaft test to my parole officer." He stated that he and Barnes were talking about getting married. He said that he had referrals for a psychological evaluation and for a counselor before he was incarcerated. He stated that both of his vehicles could travel an hour's distance.

On cross-examination by the ad litem, Hall stated that he currently had a traffic citation in Pulaski County, which he received on March 30, 2016. He said that he was ticketed in February 2015 for driving on a suspended license, but that his license was reinstated in February 2016. He testified that Barnes asks him all the time to take her to Fordyce, but he is unable to because they "have to do maintenance work on the vehicles." He stated that one of his vehicles is down and that the other one has bad tires. He admitted that he missed his March 25, 2015 psychological evaluation, but he stated it was because he had to report to his probation officer. He said that since his release, DHS had informed him that he would be referred for a psychological evaluation. He stated that he completed his counseling, but that he had requested a new counseling referral since his release. He testified that he was ready to take on all five of the children if they were returned. He said that he would put E.B. and Z.R. to work as a form of discipline. He stated that he completed parenting classes in prison. He denied using any drugs, being around people using drugs, or dealing drugs.

Kathy Crow, the CASA worker assigned to the case, testified that she had seen Hall twice at visitations and that she was able to observe that he had a bond with his children. She

15

stated that Hall did not bring food, gifts, or any other items for the children during the visits she observed. She testified that Hall had helped Barnes since being released by providing her with transportation and sharing the house together. She stated that Hall told her that he was "determined not to be involved in any kind of drugs. That he did not drink and never had." She also stated that Hall said he and Barnes were working together to maintain sobriety. Crow said that based on her interaction with Hall, he is trying to be "helpful as opposed to hurtful in the reunification process." She also stated that Hall had "shown love and bonding with his children."

On cross-examination by DHS, Crow stated that she participated in preparing the CASA report, and that she and her co-volunteer recommended terminating the parental rights of both appellants based on the hair-follicle test.

Upon cross-examination by the ad litem, Crow said that she was not able to observe any visits by Hall before he went to jail.

An order was entered on June 9, 2016, finding that it was in the children's best interest to have appellants' parental rights terminated and that they would be at risk of harm if returned to appellants. Appellants filed timely notices of appeal. This appeal followed.

We review cases involving the termination of parental rights de novo.[9] While we review the factual basis for terminating parental rights under a clearly erroneous standard, no deference is given to the circuit court's decision with regard to errors of law.[10] An order

---

[9] *Griffin v. Ark. Dep't of Health & Human Servs.*, 95 Ark. App. 322, 236 S.W.3d 570 (2006).

[10] *Id.*

forever terminating parental rights must be based on clear and convincing evidence that termination is in the child's best interest and that a statutory ground for termination exists.[11] Best interest includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the juvenile to the parent.[12]

The trial court terminated Barnes's parental rights based on all three grounds alleged in DHS's petition. However, only one ground must be proved to support termination.[13] Barnes argues that the evidence was insufficient to support the failure-to-remedy or the subsequent-issues grounds. More specifically, she contends that DHS failed to offer meaningful effort or appropriate services in the form of inpatient drug treatment and budgeting or cash assistance. As to the aggravated-circumstances ground, she argues that "there can not be a little likelihood finding when all appropriate services were not provided to her." In finding that Barnes had subjected the children to aggravated circumstances, the court stated

> DHS can provide services for parenting, counseling, addiction treatment, and other relevant issues. It is up to the parent to participate fully and meaningfully, and to demonstrate a change in circumstances. The Court cannot find that this mother has done so. She still completely lacks forethought or insight. At the April 21, 2016 hearing, mother could not articulate any summer childcare plans for the children, were they to be returned to her, other than taking the older children to the YMCA and the younger ones to a daycare on Asher as she did prior to their removal. Mother later admitted that she had not actually looked into childcare arrangements and was unaware that Little Rock had no YMCA at this time. There has been testimony throughout this case, including the March 7, 2016 termination hearing, that mother struggles to maintain control of the children during visitation, and she needs redirection with

---

[11]Ark. Code Ann. § 9-27-341(b)(3)(A).

[12]*Donley v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 335.

[13]*Lee v. Ark. Dep't of Human Servs.*, 102 Ark. App. 337, 285 S.W.3d 277 (2008).

parenting the younger children. Mother has heard time and again that she needed to get stable and work on reunification with her children, yet she chose to resume a relationship with Mr. Hall as soon as he was released from incarceration. It is well-settled that even full completion of a case plan may not defeat a petition to terminate parental rights. *Davis v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 815, 370 S.W.3d 283 (2009); *Wright v. Ark. Dep't of Human Servs.*, 83 Ark. App. 1, 115 S.W.3d 332 (2003). What matters is whether completion of the case plan achieved the intended result of making the parent capable of caring for the child. *Id.* The Court finds in this matter, by clear and convincing evidence, that Erica Barnes is not capable of safely caring for these children. There has been too much inconsistency and too many games for this Court to believe any of these children could safely be returned to the mother at any time that would be reasonable from the perspective of any of the children. Mother has jumped through the hoops as far as completion of services, but the Court does not find that the mother has benefitted from the services received. The Court is not convinced that additional counseling, budgeting courses, intensive family services, or any other available service would make an appreciable difference towards reunification. Mother seems fully cognizant of the choices she makes, and she can provide rationalizations for all of them. She minimizes problems instead of acknowledging them and looking for solutions. Therefore, the Court finds that there is little likelihood that further services would result in successful reunification with the mother, which is aggravated circumstances.

Although Barnes had successfully completed parenting classes, she still had to be redirected during visitation with her children. The completion of those services did not put her in a capable position to care for her children. Thus, the court's finding that there was little likelihood that continued services to the family would result in successful reunification is not clearly erroneous. Because we find no clear error with this ground, it is unnecessary to address the other grounds.[14]

Barnes also contends that termination of her parental rights was not in the children's best interest because, "some or all of these children are not adoptable." This argument is without merit. The court is not required to find by clear and convincing evidence that the

---

[14]*Sarut v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 76, 455 S.W.3d 341.

children are adoptable but merely must consider the likelihood of adoption if parental rights are terminated.[15]   Generally, a caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding.[16]  The adoption specialist testified that the children were adoptable despite the medical, behavioral, and developmental issues suffered by the older children.  She stated that there were ten adoption resources if all the children were adopted together and that the number of resources increased if the three younger ones were adopted as a group and the two older ones were adopted individually.  This evidence was sufficient to support the court's finding that the children were adoptable.

Hall argues first that the trial court erred in terminating his parental rights because DHS failed to properly plead the potential-harm prong in its petition.  According to Hall, he was not put on notice "with regard to the potential-harm prong or the facts to support that required element."  In support of his contention, Hall cites to cases in which a parent was not put on notice of all of the grounds on which termination would be sought.[17]  This case is distinguishable from those cases because potential harm is not a ground; it is an element inherent in the best-interest analysis, which must be satisfied in order to support the termination of a parent's parental rights.  He further contends that termination was not in the children's best interest because DHS "basically ignored" him and, had he had the benefit of services, he would be capable of caring for his children.  As discussed below to support the

---

[15]*Miller v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 239, 492 S.W.3d 117.

[16]*Abram v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 437, ___ S.W.3d ___.

[17]*Jackson v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 411, 429 S.W.3d 276; *K.C. v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 353, 374 S.W.3d 884.

ground for termination, Hall's prison sentence was sufficient to support the court's best-interest finding of potential harm as it relates to Hall. A parent's past behavior is often a good indicator of future behavior.[18]

The court relied on three grounds to terminate Hall's parental rights: the subsequent-factors ground, the aggravated-circumstances ground, and the sentenced-in-a-criminal-proceeding ground. Only one ground is necessary to support the termination of Hall's parental rights. In finding that Hall was sentenced in a criminal proceeding for a period of time that would constitute a substantial portion of his children's lives, the court wrote

> It was also subsequent to the filing of the original petition that Mr. Hall received a thirty-six month sentence for theft by receiving (a class C felony) in case number 60CR-11-218 and a thirty-six month sentence for possession of a controlled substance (a class C felony) in case number 60CR-11-2880. Both were sentences to the Arkansas Department of Correction. Certified copies of these two sentencing orders were admitted into evidence as Petitioner's Exhibits 5 and 6. He testified that he served around nine (9) months of the sentences, and he was currently released on parole and would be under rules of parole until February 2018. Based on the ages of the children and the sentence received, the Court finds by clear and convincing evidence that Tyshon Hall has been sentenced in a criminal proceeding for a period of time that would constitute a substantial portion of [T.H.1's, T.H.2's and E.H.'s] lives. The Court likewise finds by clear and convincing evidence that it is in the children's best interests to terminate Father's parental rights to them. Mr. Hall is released from prison, but he is still be subject to parole and its requirements, which could result in reincarceration were he to fail to comply. His ADC time computation, admitted as Attorney Ad Litem exhibit 1, indicated that he also has prior convictions for aggravated assault (a class D felony), and possession of a firearm by certain persons (a class D felony). Mr. Hall also indicates in his letter to the clerk, also part of Attorney Ad Litem Exhibit 1, that his thirty-six month sentence mentioned *supra* was a result of his third violation of probation. The Court also notes that testing positive for illegal substances is a violation of his parole. Mr. Hall had a hair drug screen while living with Ms. Barnes after his release, collected in February 2016, that was positive for cocaine. Taking all of this into consideration, the odds of further compliance with his parole conditions are not in Mr. Hall's favor, and this Court does not wish to

---

[18]*Hernandez v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 250, 492 S.W.3d 119.

gamble the children's stability and permanency. *See Moses v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 466, 441 S.W.3d 54; *Hill v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 108, 389 S.W.3d 72.

At the time of the termination hearing, Hall had just been released from prison for his third violation of probation. He received a sentence of three years' imprisonment, although he served only nine months before being released on parole. However, he was subject to parole until February 2018. Since his release, he had already tested positive for cocaine in a hair-follicle test. The children were one, two, and three years old at the time of the termination hearing, and given their young ages, a three-year prison sentence is a substantial portion of their lives. On these facts, we cannot say that this finding was in error.

Affirmed.

GLOVER and WHITEAKER, JJ., agree.

*Dusti Standridge*, for appellant Erica Barnes.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant Tyshon Hall.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.