Cite as 2022 Ark. App. 198

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-21-525

|  |  |  |
|---|---|---|
| | | **Opinion Delivered** May 4, 2022 |
| KARRIE CANCEL | | |
| | APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT |
| V. | | [NO. 66FJV-20-106] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | | HONORABLE ANNIE HENDRICKS, JUDGE |
| | APPELLEES | AFFIRMED |

## LARRY D. VAUGHT, Judge

Karrie Cancel appeals the Sebastian County Circuit Court's order terminating her parental rights to her three minor children, RC (born June 13, 2016), EC1 (born April 13, 2017), and EC2 (born August 14, 2018).[1] On appeal, she argues that there was insufficient evidence to support the court's finding that termination was in the children's best interest. We affirm.

On October 20, 2019, Karrie gave birth to her fourth child, JC. He was born with THC in his system, had severe medical issues, and was hospitalized in Kansas City, Missouri. The Arkansas Department of Human Services (DHS) exercised a seventy-two-hour hold on Karrie's three older children on February 25, 2020, due to Karrie's drug use, failure to comply

---

[1]The circuit court also terminated the parental rights of the children's father, Miguel Cerda, but he is not a party to this appeal.

with services in a preexisting protective-services case, exposing her children to domestic violence in the home, and leaving her children without appropriate child care. On February 27, DHS filed an emergency petition for custody and dependency-neglect in which it alleged that the children were dependent-neglected due to "abuse, neglect, or parental unfitness[.]" In an affidavit attached to the emergency petition, a family-service worker explained that DHS had received a call to the child-abuse hotline informing the agency that JC's meconium had tested positive for marijuana at birth. Shortly thereafter, Karrie began experiencing suicidal ideations and sought mental-health treatment. JC remained hospitalized, and the older three children stayed with their grandmother. Karrie then continued her treatment on an outpatient basis and often traveled between her home in Arkansas and the hospital in Kansas City where JC was being treated. DHS continued to drug screen Karrie and observe her children.

At one point, an employee at the hospital where JC was being treated called DHS and expressed concern over the three older children's safety. A hospital social worker recounted hearing Karrie involved in a domestic dispute over the telephone. DHS reached out to Karrie and learned she had been in an altercation with her sister's boyfriend.

Karrie also told DHS that she struggled to pay for child care for her oldest three children while she traveled to Kansas City. Karrie discussed a child-care plan with DHS, but while Karrie was in Missouri, the children's babysitter called DHS and stated that she was unable to continue to care for the girls. DHS exercised a seventy-two-hour emergency hold on the three girls due to Karrie's inability to care for her children and her history of drug use. The circuit court entered an ex parte emergency order on February 27, placing the children in

2

the legal custody of DHS. A probable-cause hearing was held on March 4, and the children were ordered to remain in DHS custody.

An adjudication hearing began on April 29 but was continued due to the COVID-19 restrictions. The hearing was concluded on June 3, with an order entered July 8. Karrie stipulated that her children were dependent-neglected and should remain in the care of DHS. JC remained in the hospital and was not a party to the dependency-neglect action. The circuit court further noted that DHS had attempted to conduct two meetings with Karrie but that, due to Karrie's irrational behavior, those meetings could not be completed, and a case plan could not be signed. The circuit court found that the children were dependent-neglected as a result of parental unfitness.

The goal of the case was established as reunification. Karrie was ordered to maintain stable housing, employment, income, and transportation; complete parenting and domestic-violence classes; submit to a psychological evaluation and follow any recommendations; submit to a drug-and-alcohol assessment and follow any recommendations; have candor with all treatment providers and examiners; remain drug-free; submit to random drug screens; resolve her criminal issues; keep DHS informed of any major life event and contact information; and visit regularly with her children. The next hearing in the matter was a review hearing held on August 12. An order was not entered, however, until January 11, 2021, which was five months after the hearing. The goal of the case remained reunification.

Karrie's son, JC, passed away a month before the review hearing. As a result, Karrie's progress was delayed. At the time of the hearing, Karrie had a home, employment, and transportation. She completed parenting classes but not domestic-violence classes, stating that

DHS failed to provide her with a referral for that service. Karrie had scheduled her psychological evaluation and drug-and-alcohol assessment, and she requested additional counseling to work through her grief over the loss of her son.

On February 24, the court held a permanency-planning hearing. In the permanency-planning order, which was entered on April 19, the circuit court found that it was in the children's best interest for the case to have concurrent goals of reunification and adoption. In support of this goal change, the circuit court cited Karrie's failure to maintain stable employment and transportation; failure to comply with the recommendations of her two drug-and-alcohol assessments; failure to complete anger-management classes; failure to comply with counseling; failure to attend two court-ordered hair-follicle tests; poor behavior during visits; lack of contact with DHS; and multiple arrests since the last review hearing. Additionally, the court noted that all previous court orders remained in effect, and it ordered Karrie to submit to a hair-follicle test and complete anger-management classes.

On the same day the permanency-planning hearing was held, DHS and the attorney ad litem filed a joint petition to terminate Karrie's parental rights. A termination-of-parental-rights hearing was held on April 23. The first two witnesses testified regarding a medical emergency in which there was a concern that Karrie had overdosed on drugs. There was additional testimony regarding a situation in which Karrie was uncooperative with a police officer, but she was not arrested. DHS also introduced evidence of a separate situation in which Karrie was arrested and ultimately pled guilty to public intoxication and disorderly conduct. Two DHS investigators testified regarding the circumstances that caused DHS to initially remove the children and open the case. DHS also introduced the testimony of a court-

4

appointed special advocate (CASA) volunteer, Carol Shurr, who testified that she had interactions with Karrie early in the case but that when Shurr "made it plain" that CASA "didn't work for [Karrie]," Karrie was no longer interested in "visiting" with her. Shurr observed Karrie's home to be messy but not "unlivable[.]" The CASA volunteer testified that the children loved and missed their mother.

Karrie's counselor, Stuart Whitlow, was the next witness to testify. He was working with Karrie as a part of a "co-occurring program" offered to address Karrie's substance-abuse and "grief-related" issues. Whitlow testified that without grief counseling, he would expect Karrie to continue to have problems with her other issues. He also agreed that it was possible for someone struggling with grief to make adverse decisions that were not common for that person. An additional counselor, Clay Connelly, also testified that he began providing counseling to Karrie in the month prior to the termination hearing. He had had only two sessions with Karrie at the time of the hearing.

The next witness for DHS was Catharine Stransky, the family-service worker. She stated that Karrie had not always been cooperative. Stransky testified that DHS offered a variety of services to Karrie but that she had failed to comply and utilize those services, and there were no additional services to be offered by DHS. Stransky also testified that she did not believe the children would be safe if returned to Karrie's custody due to Karrie's unstable mental condition, drug use, and problems with law enforcement.

Following Stransky's testimony, DHS rested, and Karrie moved to dismiss, which was denied by the circuit court. Karrie called three DHS workers to testify on her behalf. All three workers provided transportation services and supervised visitation for the family. Two of the

5

workers testified that the visitation between Karrie and her daughters went well, with Karrie behaving appropriately. Two of the workers also testified that they believed the children were bonded with Karrie. Next, Karrie called Karen Phillips. Phillips worked for Restore Home, which she described as "the governor's initiative to reduce the number of children in foster care and incarceration." Phillips first began working with Karrie and her family in December 2019. Phillips testified that Karrie was cooperative, and she believed Karrie "always want[ed] to do the very best for her children" and "definitely tries very hard to do everything that's asked of her." Karrie also called Trudy Smith, a case manager at STEPS Family Resource Center. Smith met Karrie approximately six months prior to the termination hearing. Smith provided parenting classes to Karrie and testified that Karrie consistently participated in those classes, even when she was at the hospital visiting JC.

Karrie also testified at the termination hearing. She stated that she had maintained the same home since September 2, 2019. She said that she was also working two jobs. Karrie admitted that she began some services but did not complete them. She explained that once her son's situation became dire, DHS recommended Karrie "pause" her services to focus on JC, which she did. Following JC's death, Karrie requested additional time before jumping right back into services. Karrie stated that she had recently restarted services prior to the termination hearing. She said that she had also recently begun a new medication to assist with her mental-health issues, including her anger problems. Karrie requested that her rights not be terminated. She acknowledged that she could be difficult to work with but asked for another chance to demonstrate that she could properly parent her children. Karrie testified that she needed to finish anger-management classes and continue her counseling. She believed three additional

6

months would be sufficient for her to complete services and be ready for her children to be returned to her care.

The children's aunt and Karrie's half sister, Sylvia Arrezondo, also testified at the termination hearing. Sylvia stated that she lives in Houston, Texas, and she had requested to be considered for placement of her nieces in December. Sylvia said that she had spoken to someone in the Arkansas DHS system about beginning the placement process required under the Interstate Compact on the Placement of Children (ICPC). Sylvia informed DHS that the girls had previously lived with her, and she was willing to care for them again. Sylvia acknowledged that, when they previously lived with her, she had contacted child protective services (CPS) in Texas and had asked that the girls be removed from her home because she could not afford to care for them. She testified that she now has the money to provide for them. Sylvia said that, after contacting Arkansas DHS in December, no one followed up with her. Sylvia testified that she began the foster-care process in Texas on her own but had not yet completed an ICPC home study. She stated that she had recently married and her new husband had never met the girls but that she was willing to adopt the children or become their legal guardian.

At the conclusion of the hearing, the circuit court granted DHS's petition and terminated Karrie's parental rights. The circuit court entered a termination order on August 24, 2021. In the order, the court found that the children had been adjudicated dependent-neglected, had continued out of the custody of their parents for twelve months, and despite a meaningful effort by DHS to rehabilitate the parents and correct the conditions that caused removal, the parents had failed to remedy those conditions. The court also found that other

7

factors or issues had arisen subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the children in the custody of the parents is contrary to the health, safety, or welfare of the children and that, despite the offer of appropriate family services, the parents manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the circumstances, which prevents the placement of the children in their custody. Third, the court found that there was little likelihood that additional services would result of successful reunification. The court further found that termination of Karrie's parental rights was in the children's best interest and that the girls are adoptable. It also found that, if returned to Karrie's custody, the girls would be at risk of harm, explaining that "the risk of harm to the juveniles if returned to a parent is both physical and psychological in nature." The court stated that Karrie "is hardly able to provide for her own needs, and her mental and emotional instability result in a volatile and chaotic environment that would· be dangerous for children." This timely appeal followed.

On appeal, Karrie challenges only the court's best-interest finding. We will affirm a termination of parental rights where clear and convincing evidence shows (1) that the termination is in the best interest of the children, and (2) at least one of the nine available statutory grounds for termination exists. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2021); *Chaffin v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 522, at 2, 471 S.W.3d 251, 254. In determining whether termination is in the best interest of the children, the circuit court must consider all the factors in the case, including the likelihood that the children will be adopted and the potential harm that would be caused by returning the children to the custody of the parent. *Chaffin*, 2015 Ark. App. 522, at 5, 471 S.W.3d at 255. Adoptability and potential harm, however,

8

are merely two factors to be considered and need not be established by clear and convincing evidence. *Id.* at 5, 471 S.W.3d at 255. In addition, the evidence presented on potential harm must be viewed in a forward-looking manner and considered in broad terms, but a circuit court is not required to find that actual harm will result or to affirmatively identify a potential harm. *Id.*, 471 S.W.3d at 255. This court may not reverse a termination of parental rights unless the termination findings were clearly erroneous such that the reviewing court, after reviewing the entire record, is left with a definite and firm conviction that the circuit court below made a mistake. *Id.* at 3, 471 S.W.3d at 254. In deciding whether a finding of the circuit court is clearly erroneous, the appellate court gives great deference to the superior opportunity of the circuit court to observe the parties and to judge the credibility of witnesses. *Id.* And only one statutory ground must be proved to support termination. *Barnes v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 618, at 17, 508 S.W.3d 917, 927.

Karrie does not dispute the court's findings as to grounds. Because the factual findings supporting those grounds are unchallenged on appeal, they may inform the appellate court's decision on best interest. *Phillips v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 383, at 16, 585 S.W.3d 703, 711 (affirming the circuit court's best-interest determination where none of the statutory-grounds findings were challenged); *see also Taylor v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 264, at 13 (holding that because the parent never appealed any of the circuit court's findings that return to the parent's custody would be contrary to the child's welfare, those findings were "conclusively established").

Karrie's first argument is that the court's best-interest finding is not supported by sufficient evidence because she simply needed more time to complete services and work the

case plan in order to successfully regain custody of her children. It is well established that, in termination cases, a child's need for permanency and stability may override a parent's request for more time to improve the parent's circumstances. *Rylie v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 366, at 7, 554 S.W.3d 275, 278. "The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective." *Villaros v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 399, at 5, 500 S.W.3d 763, 766 (citing Ark. Code Ann. § 9–27–341(a)(3)).

While all parties acknowledged that Karrie's progress was understandably delayed due to the tragic death of her infant son, she also failed to comply with the case plan throughout the case. In fact, the court specifically found that there was little likelihood that further services would lead to successful reunification, and Karrie has not challenged that finding on appeal. Karrie failed to attend counseling; she failed to submit to hair-follicle tests; she failed multiple drug screens; she failed to comply with the recommendations of her drug-and-alcohol assessment and psychological evaluation; she continued to use illegal drugs; she failed to maintain stable employment and appropriate housing; she provided inaccurate information to providers during her assessments; and she failed to complete anger-management classes. During the case, Karrie also incurred several criminal charges, including aggravated assault.

Karrie also argues there was insufficient evidence of potential harm because she has a bond with the children. We have previously rejected this argument because the existence of a

bond between parent and child does not override the court's findings as to grounds and best interest. *Holdcraft v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 151, at 12, 573 S.W.3d 555, 562.

Karrie's second argument is that termination was reversible error because there was a relative available to take the children. She contends that the availability of her half sister to care for the children means that termination was unnecessary and not in the children's best interest. On appeal, DHS argues that Karrie failed to preserve this argument because she did not argue to the circuit court that because a relative was available, termination should not be granted. We disagree that Karrie failed to preserve this argument because she specifically presented testimony regarding the availability of relative placement as an alternative to termination.

This argument provides no basis for reversal, however, because there was sufficient evidence to support the circuit court's finding that immediate termination of Karrie's parental rights is in the children's best interest. Moreover, Sylvia had not completed an ICPC home study, and there was evidence suggesting that Sylvia may not be an appropriate placement for the children. For example, Sylvia did not have a strong relationship with the girls. Despite them having lived with her for six months in 2019, she testified that she now had no contact with them and kept up with them only by seeing what Karrie posted on social media. Additionally, Sylvia's new husband had never met the girls. Most notably, Sylvia had called CPS in Texas while the girls were living with her and had asked CPS to come pick them up because she said she could not afford to care for them. While she claimed to now have sufficient income to provide for them, the court was not obligated to believe her. Under the Juvenile Code, the court was also not required to delay permanency for the girls in order to

11

accommodate a relative who may not have been an appropriate placement. *See Bridges v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 50, at 8, 571 S.W.3d 506, 511. Finally, Sylvia testified that if "things didn't work out" regarding Karrie's efforts to oppose termination of her parental rights, Sylvia would be willing to adopt the children, meaning that termination of Karrie's parental rights would not prevent DHS from continuing to evaluate Sylvia as a potential foster or adoptive parent for the girls. We affirm.

Affirmed.

BARRETT and BROWN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.